H. Dickson Burton (4004)
Edgar R. Cataxinos (7162)
Krista Weber Powell (8019)
Steven W. Gutke (12532)
TRASKBRITT, P.C.
230 South 500 East, Suite 300
P.O. Box 2550
Salt Lake City, UT  84110
Telephone:  (801) 532-1922

Attorneys for Defendant TV Guide Magazine, LLC

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **ETAGZ, INC.**<br><br>Plaintiff,<br><br>v.<br><br>**FLAMBEAU, INC.**, a Wisconsin Corporation, and **TV GUIDE MAGAZINE, LLC**, a Delaware Limited Liability Company.<br><br>Defendants. | **TV GUIDE MAGAZINE, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**<br><br>Civil No.:  2:10-cv-00240-BSJ<br><br>U.S. District Court Judge Bruce S. Jenkins |

# Table of Contents

I.  INTRODUCTION ................................................................................................................ v

II.  STATEMENT OF FACTS AS TO WHICH NO GENUINE ISSUE EXISTS ........... vii

   A.  The Patents-In-Suit and the Prosecution History .......................................................... vii

   B.  Reexamination .............................................................................................................. xvii

   C.  Asserted Claims............................................................................................................ xxvi

   D.  TV Guide Magazines Including Computer-Readable Media .................................... xxvi

III.  ARGUMENT ....................................................................................................................... 1

   Legal Standards...................................................................................................................... 1

   A.  Etagz' Claim Of Infringement Must Be Dismissed Because TV Guide's Accused Magazines Do Not Include A "Label" As Required By Each And Every Claim ...................... 4

   B.  TV Guide's use of CDs and DVDs to provide additional content to the purchaser cannot infringe the '332 Patent because the practice existed in prior art examples considered by the USPTO.................................................................................................................................... 12

   C.  Etagz' Claim Of Infringement Of Claims 1, 26 And 29 And Dependent Claims Therefrom Must Be Dismissed Because They Require Joint Infringement By More Than One Party  14

   D.  Etagz' Cannot Assert Infringement Against TV Guide Based on New Claims Added To The '332 Patent During The Reexamination .......................................................................... 17

IV.  CONCLUSION ................................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001).... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) ................................................................ 1

*Avia Group Int'l. Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988)......... 1

*Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247, 1249-50, 44 U.S.P.Q.2D (BNA) 1859, 1861 (Fed. Cir. 1997)................................................................ 17

*BMC Resources Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007) ................ 16

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001)....... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ................................................................ 1, 2

*Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). 15, 16

*Ciba-Geigy Corp. v. Alza Corp.*, 864 F. Supp. 429, 432 (D.N.J. 1994) ........................................ 1

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabuskhiki Co., Ltd.,* 535 U.S. 722 (2002) ................... 7

*Innogenetics v. Abbott Laboratories,* 512 F.3d 1363, 1370 (Fed. Cir. 2008)................................ 4

*Innovad, Inc. v. Microsoft Corp.*, 260 F.3d 1326 (Fed. Cir. 2001)................................................ 4

*Laitram Corp. v. NEC Corp.*, 163 F.3d 1342(Fed. Cir. 1998).............................................. 17, 18

*Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985)........................................... 2, 12

*Liquid Dynamics Corporation v. Vaughan Company, Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) ................................................................ 2

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)................................................................ 2, 3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)...................... 1, 2

*Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ........................ 3

*Microsoft Corp. v. Multi-Tech Sys.,* 357 F.3d 1340 (Fed. Cir. 2004)........................................ 5

Monsanto Company v. Syngenta Seeds, Inc., 503 F.3d 1352, 1359 (Fed. Cir. 2007)................. 12

*Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) .......................... 2, 12

*Pandora Jewelry, LLC v. Chamilia, LLC*, 2008 U.S. Dist. LEXIS 61064 at \*34–\*37 (D. Maryland 2008)................................................................ 17

*Peters v. Active Mfg. Co.,* 129 U.S. 530, 537 (1889)................................................................ 12

*Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005) ............................................ 3, 11

*Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998) ................ 2

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)................ 3

*Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005)........................................ 6

*Schering Corp. v. Geneva Pharms., Inc.,* 330 F.3d 1373, 1379 (Fed. Cir. 2003)........................ 12

*Tesco Corp. v. Weatherford Int'l, Inc.* 722 F.Supp.2d 737 (S.D. Tex. 2010)................................ 7

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ...................... 2, 3, 11

Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1552 (Fed. Cir. 1989)................. 12

*Warner-Jenkinson Corp. v. Hilton Davis Corp.*, 520 U.S. 17, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)................................................................ 12

**Statutes**

35 U.S.C. § 252................................................................ 17

35 U.S.C. § 307(b) ................................................................ 17

37 C.F.R. §1.75 ................................................................................................ 18

37 C.F.R. §1.75(b). .......................................................................................... 18

37 C.F.R. 1.53(b) ........................................................................................... viii

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................................... 1

**Regulations**

M.P.E.P. 201.07 .............................................................................................. viii

Defendant TV Guide Magazine, LLC ("TV Guide") submits the following memorandum in support of its Motion for Summary Judgment of Non-Infringement.

## I.    INTRODUCTION

Plaintiff Etagz, Inc. ("Etagz") alleges that TV Guide infringes certain claims of U.S. Patent No. 6,298,332 (the "'332 Patent"), which addresses the use of product "labels" that are in the form of computer-readable media, such as CD ROM discs.  Specifically, Etagz asserts that TV Guide's occasional sales between 2004 and 2008 of its "TV GUIDE" magazine with attached CDs and DVDs infringed claims of the '332 Patent. Etagz' claims fail as a matter of law because magazines have been sold with CDs and other computer readable media since at least 1984, fifteen years before the application for the '332 Patent was even filed.  Because every claim of the '332 Patent requires a "label," and because the Patent Office and Etagz consistently agreed during patent prosecution that the claimed term "label" did *not* encompass CDs and other computer discs provided with magazines, TV Guide does not and cannot infringe the '332 Patent.  Because the facts are not in dispute and additional discovery would be futile, summary judgment should be entered now to save the parties and the Court the significant time and expense of continuing this litigation.

The invention of the '332 Patent, the original application for which was filed on May 6, 1999, purports to cover use of a "computer readable medium" such as a CD, as a "label" for a product.  Instead of a traditional "hang-tag" label, a manufacturer would attach a CD, which would contain additional product or vendor information that the purchaser could access at home on a computer.  This is the crux of the '332 Patent invention.[1]  However, since as early as 1984

---

[1] The title of the '332 Patent is "CD-ROM Product Label Apparatus and Method."

magazines such as PC Gamer and other computer magazines were frequently sold with computer disks containing games, utilities and other software programs. Thus, computer-readable media attached to a magazine were not novel in 1999 and cannot be considered a "label" within the meaning of the invention of the '332 Patent. This was expressly recognized by the United States Patent and Trademark Office ("USPTO") examiner and agreed to by Etagz in patent prosecution.

On eight occasions between 2004 and 2008, TV Guide attached CDs and DVDs to its magazines as special promotions. These CDs and DVDs included special audio recordings and video clips (such as a rare Elvis Presley recording, or upcoming TV episodes or movies), thereby providing additional audiovisual media content for the magazine purchasers. The CDs and DVDs were not "labels" or substitutes for traditional hang-tags that are found on some products. Indeed, TV Guide continued to prominently display its magazine title "TV Guide" on the cover of all magazines, along with other product and publisher information in its usual locations on the cover and inside the magazine. The CDs and DVDs were merely additional promotional items containing desirable content to attract new customers to the magazine. TV Guide's use of the promotional CDs and DVDs is the same as computer and video game magazines long before the invention of the '332 Patent.

Etagz originally asserted only claims 11 and 16 against TV Guide in this case. *See* Second Amended Complaint (Docket No. 38, ¶11). Those claims were challenged in a reexamination proceeding before the USPTO and have now been cancelled by the USPTO examiner. While Etagz has appealed the examiner's decision, Etagz has represented to the parties and the Court that it will amend its Complaint again to dismiss claims 11 and 16 from this

case.[2] Instead, Etagz has indicated its intention to pursue claims 1 and 26 from the '332 Patent against TV Guide. Additionally, while no reexamination certificate has yet been issued, Etagz has also stated that it intends to assert against TV Guide new claims added to the '332 Patent during the recent reexamination, namely new claims 29, 31, 37 and 47.[3] As TV Guide has not sold any allegedly infringing products since 2008, long before this case was filed and the reexamination proceeding began, it cannot be found to have infringed any of the new claims which did not even exist in 2008 (and still have not been issued by the USPTO). Additionally, original claims 1 and 26, and new claim 29, each require more than one party to complete infringement. Therefore, Etagz cannot establish joint infringement against TV Guide with respect to claims 1, 26 and 29 even if they are issued by the USPTO.

For these reasons, summary judgment of non-infringement is appropriate as to all claims of the '332 Patent.

## II. STATEMENT OF FACTS AS TO WHICH NO GENUINE ISSUE EXISTS

### A. The Patents-In-Suit and the Prosecution History

1. The '332 Patent, entitled "CD-ROM Product Label Apparatus and Method," issued on October 2, 2000 from an application filed May 6, 1999 by inventor David R. Montague. [Burton Decl., Exh. 1 ('332 Patent)].

2. Etagz claims ownership of the '332 Patent through assignment. [Docket No. 28, ¶ 3].

---

[2] Counsel for Etagz made these representations in Court at the December 9, 2011 Status Conference. As of the date of this Motion, no new Amended Complaint has been filed.

[3] These new claims have been approved by the USPTO Examiner and are expected to be formally issued in coming months through a Reexamination Certificate.

3.　　U.S. Patent No. 7,703,686 (the "'686 Patent"), entitled "Consumer-Computer-Readable Product Label Apparatus and Method," issued on April 27, 2010 and matured from an application filed July 9, 2009. [Burton Decl., Exh. 2 ('686 Patent)].

4.　　Etagz asserted the '686 Patent against TV Guide in its Second Amended Complaint filed on June 4, 2010.　[Docket No. 38].　On October 25, 2010, based on Etagz' stipulation, the Court dismissed Etagz' infringement claims against TV Guide with respect to the '686 Patent. [Docket Nos. 75, 76].

5.　　The '686 Patent is part of the '332 Patent family and claims priority to the same original application.　This fact is important to this Motion relating to the '332 Patent because statements made by the USPTO examiner and admissions by Etagz in the prosecution of the '686 Patent are instructive as to whether CDs attached to magazines are "labels."

6.　　Specifically, the '686 Patent is a continuation[4] of U.S. Patent No. 7,503,502 (not asserted here), which is a continuation of another patent application (serial number 09/488,079), which is a continuation-in-part of the '332 Patent. [Burton Decl., Exh. 2 ('686 Patent)].

7.　　The front page of the '686 Patent is shown below, with a box drawn around the "Related U.S. Application Data" to show the direct relationship between the '686 Patent and the '332 Patent as being part of the same patent family.

---

[4] A continuation is a second patent application for the same invention claimed in a prior application under 37 C.F.R. 1.53(b).　The disclosure presented in the continuation must be the same as that of the original application. *See* M.P.E.P. 201.07.　Continuations that claim the benefit of the same parent application are said to be part of the same patent family as the parent application.



[Burton Decl., Exh. 2 ('686 Patent)]. The Related U.S. Application Data section shown in the drawn box from the previous figure of the '686 Patent is enlarged below:

> ## Related U.S. Application Data
>
> (63)  Continuation of application No. 11/622,350, filed on Jan. 11, 2007, now Pat. No. 7,503,502, which is a continuation of application No. 09/488,079, filed on Jan. 20, 2000, which is a continuation-in-part of application No. 09/306,077, filed on May 6, 1999, now Pat. No. 6,298,332.

*Id.*

8.    The following figure graphically shows the direct relationship between the '686 Patent and the '332 Patent as being part of the same patent family. The '332 Patent and the '686

Patent are shown in bold. The '332 Patent is termed the "parent application" for the family, and the '686 Patent may be termed a "grandchild application" for the family.



*Id.*

9.      The '332 and '686 Patents describe the invention of this family of patents identically: "[t]his invention relates to product labeling and, more particularly, to novel systems and methods for providing electronic feedback and user information by registration with vendors of products." [Burton Decl., Exh. 1 ('332 Patent, 1:5-10); Burton Decl., Exh. 2 ('686 Patent, 1:16-20)].

10.      Every claim of the '332 Patent requires (as does the '686 Patent), either directly or by dependency, a "label" comprising or integrated with a computer-readable medium. [Burton Decl., Exh. 1 ('332 Patent, 16:30-18:57)].

11.      The '332 Patent (like the '686 Patent) only discusses the claim term "label" in passing. For example, the '332 Patent refers to the label interchangeably as a "CD-ROM hang-tag." [Burton Decl., Exh. 1, col. 3, lines 3-5]. The figures of the '332 Patent and '686 Patent

depict the label as a tag that one might find attached to an article of clothing. [Burton Decl., Exh. 1, FIG. 3, Exh. 2, FIGS. 11, 12 and 13].

12.     Figure 3 of the '332 Patent is shown below:



*Fig. 3*

[Burton Decl., Exh. 1, FIG. 3].

13.     Figures 11, 12, and 13 of the '686 Patent are shown below:



Fig. 11

Fig. 12

Fig. 13

[Burton Decl., Exh. 2, FIGS. 11, 12 and 13].

14.     During prosecution of the '332 Patent, the examiner rejected the pending claims

as obvious based on U.S. Patent No. 5,825,292 to Tsai et al., entitled "Electronic Article

Surveillance Markers for Direct Application to Optically Recorded Media," in combination with multiple other patents. [Burton Decl., Exh. 4 (July 13, 2000 Office Action); Burton Decl., Exh. 3, U.S. Patent No. 5,825,292)].

15.     In response to the examiner's rejection, Etagz argued that "Tsai appears to teach the product as the computer-readable medium, as compared to the label as the computer-readable medium in the claimed invention." [Burton Decl., Exh. 5 (November 20, 2000 Amendment and Response to Office Action, at 6)].

16.     In the November 20, 2000 Amendment and Response, Etagz explained further that:

> Display, promotional, and direct-mail labels limit the vendor to dissemination of general, broad information regarding the products and services. Labels associated with a particular product allow dissemination of very broad vendor related information as well as particular product specific information.

[Burton Decl., Exh. 5 (November 20, 2000 Amendment and Response to Office Action, at 7)].

17.     During prosecution of the '686 Patent, the examiner made the following statement in a September 14, 2009 Office Action:

> In not making an art rejection . . . on claims 1 and 16, the examiner notes the following understanding of the claims, in accordance with [the inventor's] own specification and remarks on the record.
>                                         . . .
> [A] 'label' would not be a term used to describe just any accompanying CD that is often included in a sleeve of a book such as a textbook or a children's book. In general, these accompanying CDs attached to books, while meeting other limitations present in the claims, do not act as a label for the book.

[Burton Decl., Exh. 6 (September 14, 2009 Office Action, at 5)].

18.     In that same Office Action, the examiner stated "[t]he prior art made of record and not relied upon is considered pertinent to applicant's disclosure. Koehn (US 6,068,117) and Pace at al. (US 6,126,201) are noted." *Id.*

19. U.S. Patent No. 6,068,117 to Koehn (the "'117 Patent"), entitled "Book Insert CD Carrier Device," and filed with the United States Patent and Trademark Office on July 14, 1999, states that "[t]he present invention generally relates to a book insert and, more particularly, to a book insert having one or more pockets for carrying compact disks." [Burton Decl., Exh. 7 ('117 Patent, 1:1-6)].

20. U.S. Patent No. 6,126,201 to Pace, et al. (the "'201 Patent"), entitled "Folder for Binding and Mailing Compact Discs," and filed with the United States Patent and Trademark Office on January 6, 1998, states that "[t]he present invention relates generally to compact disc folders, and more particularly, to an improved, bindable compact disc folder that can be easily bound into a publication, *such as a magazine* as well as mailed separately." [*Id.*, Burton Decl., Exh. 8 ('201 Patent, 1:1-14, emphasis supplied)].

21. The '201 Patent also states that "[i]n the computer arts, many major computer-related magazines such as BYTE, PCWORLD and others, supply CD-ROMS to their subscribers with certain magazine issues." [*Id.* at 1:28-31].

22. In its December 14, 2009 Response to the September 14 Office Action, Etagz did not contest or contradict the examiner's characterization of the scope of the claim language. [Burton Decl., Exh. 9 (December 14, 2009 Response to Office Action)].

23. Also in connection with its prosecution of what became the '686 Patent, on December 14, 2009, Etagz filed an Information Disclosure Statement listing several new references, including two Wikipedia entries – "PC Gamer" (http://en.wikipedia.org/wiki/PC_Gamer), and "Covermount" (http://en.wikipedia.org/wiki/Covermount) – as well as a website entitled "Old CD Magazines /Magazine CDs for download" from the website "VOGONS" (Very Old Games On New

Systems) (http://www.vogons.zetafleet.com/viewtopic.php?p=168435). [Burton Decl., Exh. 10 (December 14, 2009 Information Disclosure Statement)].

24.    The "PC Gamer" reference submitted by Etagz in the December 14, 2009 Information Disclosure Statement states, among other things:

> The British edition of *PC Gamer* has been in constant monthly publication since 1993. . . . The magazine originally shipped with an accompanying 3.5-inch (89 mm) floppy disk. A CD demo disc (labelled [sic] *CD Gamer*) was released alongside the floppy disk edition from issue 11 onwards with the first *CD Gamer* containing all the content from the previous 10 issues' floppy disks. . . .

[Burton Decl., Exh. 11, at 3].

25.    The following images are from the June 1997 Issue of PC Gamer Magazine, which shows an example of such an edition of the PC Gamer magazine including an accompanying CD attached to the front of the magazine:






[Burton Decl., Exh. 13].

26.     The PC Gamer Magazine has the "PC Gamer" logo featured prominently on the face of the printed magazine as a label for the magazine.   The accompanying CD has the "PC Gamer" logo printed on its face, which is attached to, and visible from, the front cover of the magazine.  *Id.*

27.     The "Covermount" reference submitted by Etagz in the December 14, 2009 Information Disclosure Statement states, among other things:

> Covermount (sometimes written *cover mount*) is the name given to storage media (containing software and or audiovisual media) or other products (ranging from toys to flip-flops) packaged as part of a magazine or newspaper. The usual method of packaging is to place the media or product in a transparent plastic sleeve and mount it on the cover of the magazine with adhesive tape or glue, hence the name.

This reference also states that the practice of covermount dates back to at least 1984. [Burton Decl., Exh. 12, at 1].

28.     The Covermount reference further states that "[a]lthough tagged as 'free', covermount discs sometimes increase the price of a magazine.  Magazines that carry discs can cost as much as double the price of other magazines without them." [Burton Decl., Exh. 12, at 3].

29.     The "Old CD Magazines / Magazine CDs for download" page shows "old CD magazines. . . from 1994-6," including the December 1994, June 1995, July 1995, and October 1995 issues of *PC Gamer*. [Burton Decl., Exh. 14].

30.     In the Notice of Allowance dated February 23, 2010, indicating that the '686 Patent was going to be allowed to issue, the examiner stated:

> It is noted [that] a label is a medium which is attached to a product to indicate information about that product to which it is affixed, an aspect which is expressly claimed. It would not for instance typically include software attached to say, a book (even if the software has on it information in common with the book) because that software is not a label of the book per se. The book, or magazine or other media that commonly has included software does not need a label, for it has

the relevant information printed directly on it. A CD attached to a book is therefore not considered a label for the book.

[Burton Decl., Exh. 15 (Notice of Allowance, at 2-3)].

31.     In the March 3, 2010 Response to Notice of Allowance, Etagz stated that "[i]t is agreed that the limitations recited in the examiner's Reasons for Allowance are not taught or suggested by the art of record, and that the allowed independent claims are distinguished from the cited prior art for at least the reasons stated in the Reasons of Allowance." [Burton Decl., Exh. 16 (Response to Notice of Allowance, at 1)].

**B.     Reexamination**

32.     In its Second Amended Complaint in this matter, Etagz asserted infringement of claims 11 and 16 against TV Guide and Flambeau. (Docket No. 38, ¶11).

33.     On or about September 20, 2010, defendant Flambeau filed a third party request for a reexamination proceeding with respect to claims 11 and 16 of the '332 Patent. [Burton Decl., Exh. 17].

34.     During the reexamination proceeding, No. 90/011,244, Etagz added new claims 29 through 51. [Burton Decl., Exh., 18, (December 23, 2010 Owners' Statement, at 3-8)].

35.     In the December 23, 2010 Owner's Statement of the Reexamination, Etagz cited additional prior art for a webpage printout showing the cover and cover tape for the magazine Your Sinclair, October 1987, Issue 22; and a copy of the first six pages of the magazine *Mojo*, August of 1997, Issue #45.  [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement, at 11)].

36. The following images were provided to the examiner by Etagz. The following images are of the front side of the cover and the back side of the front cover, respectively, showing the face of the magazine and the attached CD:

 

[Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement)].

37. As seen by the copies provided by Etagz, Mojo Magazine has the "MOJO" name prominently displayed printed on the top portion of the magazine cover as a label for the magazine. The Mojo magazine identifies the CD with "FREE CD!" printed on the magazine. The Mojo magazine has a CD that is clearly displayed on the front of the magazine. The CD has the name of the magazine "MOJO The Music Magazine" printed on the face of the CD, which is also viewable from the front of the magazine. The content of the CD includes a music single that is related to the 100 Greatest Singles content contained within the Mojo magazine. [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement)].

38. In the April 8, 2011 Non-Final Office Action, the examiner explained that "it is not agreed that the consideration of Mojo magazine proposed by the Third Party requester raises

a substantial new question of patentability . . . Mojo discloses a product 'Mojo magazine' and a 'Free CD' inserted in the magazine containing several songs, and said 'Mojo magazine' and said 'Free CD' are distinct and separate. However, Mojo magazine does not suggest the teaching . . . "providing a label . . ." [Burton Decl., Exh. 19 (April 8, 2011 Non-Final Office Action, at 2, 3)].

39.     On September 20, 2010, the third party requester filed an Information Disclosure Statement listing several new references, including U.S. Patent No. 5,950,401 to Blohm, et al. (the "'401 Patent"), entitled "Method of Producing a Printed Product Having a Packaged Compact Disc. [Burton Decl., Exh. 20 (September 20, 2010 Information Disclosure Statement)].

40.     The '401 Patent states:

Due to the relatively recent surge in computer popularity, companies have begun using computer disks to convey information to potential customers. For example, some companies provide potential customers with computer disks that give textual and pictorial information about the company's products. In addition, computer disks can accompany an owners' manual to convey to the consumer information about the use of the product. The ability to store large amounts of information makes CD-ROMs particularly useful in conveying information to consumers for these purposes.

[Burton Decl., Exh. 21 ('401 Patent, 1:34-43)].

41.     The '401 Patent further states:

One way of packaging and sending computer disks to consumers is to attach the computer disk to a printed publication, such as a magazine. In this manner, the computer disk could be sent at bulk rate magazine costs, which are significantly cheaper than direct mail costs. In addition, the disks can be targeted to the specific consumers that receive the particular publication. For example, a CD-ROM that advertises expensive luxury automobiles could be attached to an automotive magazine, or possibly to a magazine directed to wealthier individuals. Further, utilizing the present invention, computer disks can be attached directly to an owners' manual, thereby safely securing the computer disk in a printed publication (i.e., the owners' manual) and avoiding the need for extra packaging for the disk.

[Burton Decl., Exh. 21 ('401 Patent, 1:66 – 2:8)].

42.     In the December 23, 2010 Owner's Statement of the Reexamination, Etagz explained that "Blohm discloses a method of producing a printed product, such as a book or magazine, having a packaged compact disk included within the printed product.  The patent owner did not find any suggestion in Blohm that the disclosed disk would act as a label for the printed product.  Thus, the disk in Blohm is not a label."  [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement, at 13)].

43.     In the April 8, 2011 Non-Final Office Action, the examiner explained that "the computer-readable medium (i.e., said CD-ROM) of Blohm is not the same as the claimed subject matter 'label' because the computer-readable medium (i.e., said CD-ROM) would not act as a label for the product."  [Burton Decl., Exh. 19 (December 23, 2010 Non-Final Office Action, at 8, 9)].

44.     Another reference filed by the third party requester in the September 20, 2010 Information Disclosure Statement listed "'Meet the Pop Twins,' Computer and Video Games Magazine, Oct. 1984, p. 11).  [Burton Decl., Exh. 20 (September 20, 2010 Information Disclosure Statement)].  This reference is shown here:

 

[Burton Decl., Exh. 22]. A clearer reference is shown above from that which is available from the USPTO.

45. The Computer & Video Games magazine clearly states that the flexi-disc was "attached to the front" of the Computer & Video Games magazine.

In case you didn't notice, attached to the front of your favourite computer games magazine is a fantastic flexi-disc with a great program imprinted in its grooves. There's also a special message to *Computer & Video Games* readers from the Twins. Tom, Alannah and Joe have also allowed us to features their hit record *Doctor, Doctor* — which has quite a lot to do with the plot of the Adventure.

Elsewhere on this page you'll find details of how to use your flexi-record. But before you start loading up the program, listen to the message and the *Thompson Twins* track! If you have never played an Adventure style game before, here's a few hints and tips. The computer will present you with a graphic screen depicting the Twins in various different locations. Below the picture you'll see some text which will describe the location and then ask you what you want to do.

[Burton Decl., Exh. 22].

46. An enlarged view of the attached flexi-disc of the Computer & Video Games is shown below:



The attached flexi-disc has the name of "Computer & Video Games" magazine printed on its visible face, as well as the contents of the flexi-disc and the maker of the adventure game. [Burton Decl., Exh. 22].

47. In the December 23, 2010 Owner's Statement of the Reexamination, Etagz explained that "the Patent Owner did not find any suggestion in CVG that the disclosed disc would act as a label for the magazine product. The disc in CVG is not a label." [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement, at 15)].

48. In the April 8, 2011 Non-Final Office Action, the examiner explained that "the computer-readable medium (i.e., said flexi disc for imprinting the program of Spectrum version in the groove) of CVG is not the same as the claimed subject matter 'label' because the

computer-readable medium (i.e., said flexi-disc) would not act as a label for the product." [Burton Decl., Exh. 19 (April 8, 2011 Non-Final Office Action, at 9)].

49.     The examiner further stated in the same Non-Final Office Action that "[t]he Third Party requester argues that the flexi-disc is labeled with the title of the magazine and thus, the flexi-disc acts as a label for the CVG magazine. Even though the flexi-disc includes 'a special message to *Computer & Video Games* readers,' the flexi-disc essentially including games cannot be understood by one of the ordinary skill in the art as labeling for the product 'CVG magazine' in light of the specification of the '332 Patent." [Burton Decl., Exh. 19 (April 8, 2011 Non-Final Office Action, at 10)].

50.     Another reference filed by the third party requester in the December 14, 2009 Information Disclosure Statement listed "Windows 95, Microsoft, August 24, 1995." [Burton Decl., Exh. 20 (September 20, 2010 Information Disclosure Statement)].

51.     The Windows 95 reference is a windows CD-ROM that includes the Windows 95 operating system. The Windows 95 CD-ROM includes a label displaying information regarding Windows 95 operating system on the face of the CD-ROM, including the source (Microsoft) of the product. [Burton Decl., Exh. 20 (September 20, 2010 Information Disclosure Statement)].

52.     In the December 23, 2010 Owner's Statement of the Reexamination, to distinguish over Windows 95, Etagz explained that "'[A] label' is distinct and separate from a 'product.'" [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement, at 11)].

53.     On December 12, 2011, Etagz filed an Appeal Brief appealing the Final Rejection of claims 11 and 16 of the '332 Patent. [Burton Decl., Exh. 23 (December 12, 2011 Appeal Brief)].

54. In the Appeal Brief of December 12, 2011, Etagz stated that "Neither the label nor computer readable medium can be the 'product,' since that term has been included elsewhere as part of other limitations. That is, the 'product' is labeled by the label." [Burton Decl., Exh. 23 (December 12, 2011 Appeal Brief, at 11)].

55. In further distinguishing over the Windows 95 CD in its Appeal Brief of December 12, 2011, Etagz stated that the "side of the CD ROM did not label the CD ROM for sale. In fact, it was not even seen at a point of purchase, but was hidden inside a box with the instructions and packaging." [Burton Decl., Exh. 23 (December 12, 2011 Appeal Brief, at 10)].

56. In its Appeal Brief, Etagz further stated that a "label" is "only for labeling the product and the 'product' is offered for sale, but the label is not offered for sale." [Burton Decl., Exh. 23 (December 12, 2011 Appeal Brief, at 11)].

57. Another reference filed by the third party requester in the December 14, 2009 Information Disclosure Statement is U.S. Patent No. 5,775,494 to Taplin, et al. (the "'494 Patent"), entitled "Floating Disk Product Package with Window Visibility, Secure Containment, and Increased Graphic Surface Area." [Burton Decl., Exh. 20 (September 20, 2010 Information Disclosure Statement)].

58. The '494 patent states that "FIG. 3B is a top or plan view of a CDROM 305 . . . THE CDROM 305 may be decorated with text messages (not shown) and/or artwork or graphics . . . visible to the consumer through the substantially transparent top lid or outer surface of the inner box." [Burton Decl., Exh. 24, '494 Patent 6:65-7:4)]. The '494 Patent states that the package may also include "a related book product" within the package. [Burton Decl., Exh. 24, '494 Patent 8:65)].

59. The '494 Patent further states:

The present packaging invention is especially suited but not limited to packaging for disk products marketed in conjunction with documentation, instruction manuals, a companion book product, catalogs or other related conventional paperbound printed materials. A preferred application of the invention is for packaging of one or more CDROMs in conjunction with related printed paperbound books. For example, DeLorme Mapping, Freeport ME 04032, assignee of the present invention, has marketed a joint CDROM and paperbound atlas of North America titled MAP'N'GO (tm). Software titles on CDROM or more traditional disk media typically are packaged with considerable printed documentation by contrast with music CDROMs, for example.

[Burton Decl., Exh. 24, ('494 Patent 12:13-26)].

60.    FIGS. 4B, 7A, and 7B are shown below:



[Burton Decl., Exh. 24 ('494 Patent FIGS. 4B, 7A, 7B)].

61.    Regarding Taplin, Etagz stated that "[the] statements from Taplin teach the use of packaging to promote sales of a CD-ROM disk product, the packaging and the product being separate and distinct.  The CD-ROM in Taplin is a product, not a label."  [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement, at 12)].

62.    In the same Owner's Statement, Etagz further stated "the Patent Owner did not find any suggestion in Taplin that the disclosed disk would act as a label for the product.  The

disk in Taplin is not a label." [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement, at 14)].

63.     Etagz' appeal of the rejection of claims 11 and 16 is currently pending before the United States Patent and Trademark Office.

**C.      Asserted Claims**

64.     Etagz asserts that TV Guide infringes claims 1 and 26 of the '332 Patent.  As shown in Exhibit 1 attached to the Declaration of H. Dickson Burton filed herewith, both claims 1 and 26 require a "label" (as do all of the claims in the '332 Patent). [Burton Decl., Exh. 1].

65.     Etagz has indicated that it will assert that TV Guide infringes claims 29, 31, 37 and 47 of the reexamined '332 Patent.  The examiner has identified these claims as "allowable," but no reexamination certificate has been issued yet. Each of claims 29, 31, 37 and 47 require a "label."  A copy of new claims from the reexamination of the '332 Patent included with the Owners' Statement filed by Etagz.  [Burton Decl., Exh. 18 (December 23, 2010 Owners' Statement, at 3-8)].

**D.      TV Guide Magazines Including Computer-Readable Media**

66.     TV Guide has included computer-readable media with its magazines on eight occasions (and only eight) as follows: July 4, 2004, May 8, 2005, August 28, 2005, June 5, 2006, August 28, 2006, December 11, 2006, August 13, 2007, and August 11, 2008. *See* ¶ 3 of the Declaration of Stephen J. Kain ("Kain Decl.") filed herewith.

67.     Each of the magazines included a CD or DVD attached to the cover of the TV Guide magazine.  As with any issue of TV Guide, the TV Guide name and logo were printed

prominently on the upper left hand corner of the front cover of the TV Guide magazine as a label for the magazine. [Kain Decl., Exhs. A-H].

68.     With the exception of just one of the eight TV Guide issues that included CDs or DVDs (the June 5, 2006 issue), the issues with CDs or DVDs were more expensive than issues of TV Guide that did not include the CDs and DVDs.  Purchasers of TV Guide paid more for the CDs and DVDs, which came with additional digital content.   For example, during 2004 and 2005, the standard TV Guide sold for $2.49, but the July 4, 2004, May 28, 2005 and August 28, 2005 editions, which had attached CDs, sold for $2.99.   Similarly, the editions from 2006 through 2008 with CDs attached sold for either $.50 or $1.00 more than the standard editions. [Kain Decl., ¶ 25].

69.     The July 4, 2004 issue ("July 2004 Issue") had two alternative versions, each of which is shown here along with an enlarged view of the CD:

 



[Kain Decl., ¶ 5, Exh. A]. The face of the mini CD includes information related to the Elvis Presley contents of the CD. The TV Guide name and logo are not depicted anywhere on the face of the mini CD. [Kain Decl., ¶ 5, Exh. A].

70. The May 8, 2005 issue ("May 2005 Issue") had two alternative versions, each of which is shown here along with an enlarged view of the CD:







[Kain Decl., ¶ 6, Exh. B].  The face of the mini CD includes information related to the Elvis Presley contents of the CD.   The TV Guide name and logo are not depicted anywhere on the face of the mini CD.  [Kain Decl., ¶ 7, Exh. B].

71.    The August 28, 2005 issue ("August 2005 Issue") is shown here along with an enlarged view of the CD:

 

[Kain Decl., ¶ 8, Exh. C].  The face of the mini CD includes information related to the LOST television show contents of the CD.   The TV Guide name is shown on the face of the mini CD as a description of the CD as "TV Guide's Audio/Video CD!"  [Kain Decl., ¶ 9, Exh. C].

72.    The June 5, 2006 issue ("June 2006 Issue") is shown here along with an enlarged view of the DVD:

 

[Kain Decl., ¶10; Exh. D]. The face of the DVD includes information related to the various television show contents of the DVD. The TV Guide logo is shown on the face of the DVD as a description of the DVD as "FREE DVD from TV Guide." [Kain Decl., ¶11; Exh. D].

73.     The August 28, 2006 issue ("August 2006 Issue") is shown here along with an enlarged view of the CD-ROM:

 

[Kain Decl., ¶12; Exh. E]. The face of the CD-ROM includes information related to the LOST television show contents of the CD-ROM. The TV Guide logo is shown on the face of the CD-ROM as a description of the CD-ROM as "Exclusive CD-ROM from TV Guide." [Kain Decl., ¶13; Exh. E].

74. The December 11, 2006 issue ("December 2006 Issue") is shown here along with an enlarged view of the CD:

 

[Kain Decl., ¶14; Exh. F]. The face of the CD includes information related to the Elvis Presley contents of the CD. The TV Guide logo is shown on the face of the CD as a description of the CD as "Happy Holidays From TV Guide." [Kain Decl., ¶15; Exh. F].

75.    The August 13, 2007 issue ("August 2007 Issue") is shown here:

 

[Kain Decl., ¶16; Exh. G]. The face of the CD-ROM includes information related to the LOST television show contents of the CD-ROM.   The TV Guide logo is shown on the face of the CD-ROM as a description of the CD-ROM as "Exclusive CD-ROM brought to you by TV Guide WAL*MART."  [Kain Decl., ¶17; Exh. G].

76.    The August 11, 2008 issue ("August 2008 Issue") had two alternative versions, each of which is shown here:





[Kain Decl., ¶18; Exh. H]. The face of the CD-ROM includes information related to the Star Wars Clone Wars contents of the CD-ROM. The TV Guide logo is shown on the face of the CD-ROM as a description of the CD-ROM as "CD-ROM brought to you by TV Guide Toys R Us." [Kain Decl., ¶19; Exh. H].

## III.    ARGUMENT

By merely attaching audio and video content on CDs and DVDs to its magazines, as others had done for at least 15 years prior to Etagz' patent application being filed, TV Guide cannot have infringed the '332 Patent. To avoid the prior art, Etagz expressly acknowledged in patent prosecution that CDs attached to magazines were not "labels." Etagz should be bound by its statements made during patent prosecution that exclude these types of products from its definition of a label, and summary judgment of non-infringement should be entered on TV Guide's behalf.

### Legal Standards

"Summary judgment is as appropriate in a patent case as in any other." *Avia Group Int'l. Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988) (citations omitted). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, only a genuine dispute over fact that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Ciba-Geigy Corp. v. Alza Corp.*, 864 F. Supp. 429, 432 (D.N.J. 1994) (citing *Anderson*, 477 U.S. at 248).

TV Guide, as the moving party, has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). TV Guide may meet its burden by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id*. at 325. Once TV Guide meets this burden, Etagz then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586- 87 (1986). Etagz must go beyond the pleadings and produce evidence of a genuine issue for trial. *Id., Celotex*, 477 U.S. at 324.

Each element of a patent claim is material and essential, and in order for a court to find infringement, Etagz must show the presence of every element in the accused product. *See Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999). The infringement analysis involves a two-step process: First, the Court must determine the scope and the meaning of the asserted patent claims, and second, the properly construed claims are compared to the accused products. *Liquid Dynamics Corporation v. Vaughan Company, Inc*., 355 F.3d 1361, 1367 (Fed. Cir. 2004). The first step involves a question of law; the second involves a question of fact. *Id.*

The meaning of language used in the patent claims is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). The Federal Circuit has provided a road map for claim interpretation: "It is well settled, that in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.* the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *See Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998).

In fact, the Federal Circuit has described intrinsic evidence as "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp.,* 90 F.3d at 1582. A court may, if necessary, also rely on extrinsic evidence, such as expert testimony, inventor testimony, dictionaries, and learned treatises, to resolve ambiguities in claims or provide background for the relevant technology. *Id.* at 1583.

The Federal Circuit expanded on *Vitronics Corp.* when it wrote, "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005).

The primary source to consider is the claims themselves. *Phillips* at 1312. Next, the claims, "as part of an integrated document…must be read in view of the specification, of which they are a part. [The specification] is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips* at 1315 citing *Markman* at 978-79. "A fundamental rule of claim construction is that terms of a patent document are construed with the meaning with which they are presented in the patent document. Thus, claims must be construed so as to be consistent with the specification, of which they are a part." *Phillips* at 1316 citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) (citations omitted). The court further advised, "the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips* at 1316 citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

Thus, to determine the meaning of claim limitations, the Court gives the words their ordinary and customary meaning as understood by a person of ordinary skill in the art and also looks to intrinsic evidence of record, *i.e.* the claim language, the patent specification (*i.e.* the written description and drawings), and the prosecution history. *Innogenetics v. Abbott Laboratories,* 512 F.3d 1363, 1370 (Fed. Cir. 2008).

Summary judgment may be granted before discovery has been completed. *See, e.g., Innovad, Inc. v. Microsoft Corp.*, 260 F.3d 1326 (Fed. Cir. 2001). Here, at this early juncture of the case, the only claim term that requires the court's attention is the term "label," which exists in every single claim of the '332 Patent. If TV Guide did not use a "label" with its products, it did not infringe any claim of the '332 Patent. In other words, if the CDs and DVDs attached to the eight issues of magazines which it sold were not product "labels," then TV Guide did not infringe any claim of the '332 Patent and this case should be dismissed now. Importantly, the Court need not determine a construction of what a 'label' is, so much as what it is not. And TV Guide's use of CDs and DVDs to provide additional media content to purchasers cannot be described as a label.

A.    **Etagz' Claim Of Infringement Must Be Dismissed Because TV Guide's Accused Magazines Do Not Include A "Label" As Required By Each And Every Claim**

The '332 Patent only discusses the claim term "label" in passing. For example, the '332 Patent refers to the label interchangeably as a "CD-ROM hang-tag." (Statement of Facts ¶11). The figures of the '332 Patent depict the label as a tag that one might find attached to an article of clothing. (*Id.*) The term was the subject of considerable discussion during prosecution of the '332 Patent. In view of the prosecution history, it is clear that a "label" is not a CD (or similar

media) attached to a magazine, as both the USPTO examiner and inventor acknowledged that magazines have included CDs, or the equivalent media, for years before the filing of the '332 Patent.

Statements made during prosecution of the '686 Patent are also relevant to how a common term—"label"—should be understood as used in the '332 Patent. *See Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001) ("The prosecution history of a related patent can be relevant if, for example, it addresses a limitation in common with the patent in suit."); *Microsoft Corp. v. Multi-Tech Sys.,* 357 F.3d 1340 (Fed. Cir. 2004). The '686 is part of the same family as the '332 Patent, and shares much of the same specification, including identical descriptions of the claim term "label."  No evidence suggests that "label" as used in the '686 Patent claims has a different meaning than as used in the '332 Patent.  The '686 Patent claims priority from the same application that resulted in the '332 Patent. (Statement of Facts ¶ 5).

In this case, the TV Guide magazine is a product having identifying information printed directly on it.  A magazine cover already contains all the relevant information for the product, including the name of the product (i.e., TV Guide), price and date of the issue as well as the contents of the product (e.g., content related to a particular TV show highlighted by the particular issue). Thus, a promotional CD or DVD attached to a magazine cannot possibly be characterized as a "label."  (*See, e.g.,* Exhs.A-H to Kain Decl. filed herewith).  This interpretation of the term "label," excluding a CD attached to a book or magazine, was confirmed by the examiner during prosecution:

> The book, or a magazine or other media that commonly has included software does not need a label, for it has the relevant information printed directly on it. A

5

> CD attached to a book [or magazine] is therefore not considered a label for the book [or magazine].

(Statement of Facts ¶ 30).

The examiner further explained that a "label" "would not for instance typically include software attached to say, a book (even if the software has on it information in common with the book) because that software is not a label of the book per se." *Id.* Neither the examiner nor the inventor intended a "label" to include a CD attached to a magazine. *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005) (an examiner's statements about a claim term are evidence of how one of skill in the art understood the term at the time the application was filed).

The examiner recognized the common practice in the prior art of including CDs with books and magazines. The examiner identified two patents that discussed this common practice and claimed methods of attaching the CDs to the book or magazine. (*Id.*) The '201 Patent states that "[i]n the computer arts, many major computer-related magazines such as BYTE, PCWORLD and others, supply CD-ROMS to their subscribers with certain magazine issues." (Statement of Facts ¶ 21). In other words, the examiner did not make a prior art rejection because the plain and ordinary meaning of "label" does not encompass the prior art practice of including CD-ROMs with magazines.

Etagz did not dispute this characterization. When Etagz submitted two Wikipedia entries (for "PC Gamer" and "Covermount"), as well as a reference entitled "Old CD Magazines / Magazine CDs for download," Etagz acknowledged the common prior art practice of including CDs packaged with magazines. This submission implicitly acknowledged that magazines such as *PC Gamer* Magazine utilized this practice long before the patents-in-suit were filed, including

such CDs being placed "in a transparent plastic sleeve and mount it on the cover of the magazine with adhesive tape or glue" as taught by the Covermount reference. (Statement of Facts ¶¶ 23, 27).

Etagz filed a response to the examiner's statement *expressly agreeing* that CDs packaged with magazines are not "labels," by stating "[i]t is agreed that the limitations recited in the examiner's Reasons for Allowance are not taught or suggested by the art of record, and that *the allowed independent claims are distinguished from the cited prior art for at least the reasons stated in the Reasons of Allowance*." (Statement of Facts ¶ 31) (emphasis added). The "cited prior art" includes both the '117 and '201 Patents, which disclose methods of packaging CDs with books and magazines, as well as the "PC Gamer" and "Covermount" references submitted by Etagz. And the "reasons stated" for allowing the claims over this art include the fact that CDs packaged with magazines are not "labels."

The prosecution history from the reexamination proceeding reaffirms that neither Etagz nor the examiner considered a CD or related media attached to a magazine to be a "label" as used in the claims.[5] The examiner considered the following August 1997 issue of Mojo magazine featuring a 'Free CD' inserted in the magazine containing several songs:

---

[5] Statements made during a reexamination are also relevant to determine the meaning of claim terms. *See, e.g., Festo Corp. v. Shoketsu Kinzoku Kogyo Kabuskhiki Co., Ltd.,* 535 U.S. 722 (2002); *Tesco Corp. v. Weatherford Int'l, Inc.* 722 F.Supp.2d 737 (S.D. Tex. 2010).



(Statement of Facts ¶ 38). Although the CD is attached to the backside of the front cover, the CD and the phrase "Mojo The Music Magazine" depicted on its face are visible through a transparent window. Ultimately, the precise placement of the CD is irrelevant as to whether the CD functions as a label because the relevant inquiry is whether the information on the alleged label is visible to the purchaser.[6] (*See, e.g.,* Statement of Facts ¶ 55).

Like the accused TV Guide products, the Mojo magazine has a CD that is clearly viewable from the front of the magazine. Like some of the accused TV Guide products, the CD attached to Mojo magazine has the name of the magazine "MOJO The Music Magazine" printed on the face of the CD, which is also viewable from the front of the magazine. The examiner stated that the CD mounted on the Mojo magazine does not suggest the teaching . . . "providing a label . . ." (Statement of Facts ¶38), which was not disputed by Etagz. The examiner did not base

---

[6] Etagz indicated that this was the relevant inquiry when it argued that the information on the face of the Windows 95 CD "did not label the CD ROM for sale. In fact, it was not even seen at a point of purchase, but was hidden inside a box with the instructions and packaging."

this determination on such a fine distinction of being attached to the outside of the front cover versus being attached to the inside of the front cover (yet still visible at the point of purchase).

During reexamination, Etagz argued what a "label," as used in the claims, was *not* by comparison with various patent documents. For example, Etagz explained that [the '401 Patent to] "Blohm discloses a method of producing a printed product, such as a book or magazine, having a packaged compact disk included within the printed product. The patent owner did not find any suggestion in Blohm that the disclosed disk would act as a label for the printed product. Thus, the disk in Blohm is not a label." (Statement of Facts ¶ 42). The examiner agreed that "the computer-readable medium (i.e., said CD-ROM) of Blohm is not the same as the claimed subject matter 'label' because the computer-readable medium (i.e., said CD-ROM) would not act as a label for the product." (Statement of Facts ¶ 43).

As another example, neither the examiner nor Etagz believed that the CD labeled with the title of the magazine and attached to the CVG magazine was a "label." (Statement of Facts ¶¶ 47, 48).



 The examiner explained that even though the flexi-disc includes "a special message to *Computer & Video Games* readers," (which includes the name of the CVG magazine) "the flexi-disc essentially including games cannot be understood by one of the ordinary skill in the art as labeling for the product 'CVG magazine' in light of the specification of the '332 Patent." (Statement of Facts ¶ 49).

Each of the CDs attached to the accused TV Guide magazines that use the TV Guide name or logo include statements such as "TV Guide's Audio/Video CD!"; "FREE DVD from TV Guide"; "Exclusive CD-ROM from TV Guide"; "Happy Holidays From TV Guide"; "Exclusive CD-ROM brought to you by TV Guide WAL*MART;" and "CD-ROM brought to you by TV Guide Toys R Us."  (Statement of Facts ¶¶ 75, 76).  These statements describe the attached disc as being a gift from TV Guide; the information displayed on the cover of the CD simply describes the promotional nature of the CD and in no way functions as a "label" of the magazine itself.  Therefore, not only are the CDs with visible information categorically excluded

from being a label, but even the way the TV Guide name and logo are displayed on the CD does not function as a label for the printed magazine.

Etagz has expressly excluded the Mojo magazine with a CD, the CVG magazine, and the '401 Patent from the definition of "label." Having adopted the examiner's reasoning in prosecution, Etagz cannot now ignore it in litigation. The prosecution history – especially in this case – provides evidence of how the PTO and the inventor understood the patent. *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1317 (Fed. Cir. 2005). Given the clarity of the examiner's statements, and Etagz' acknowledgement of the prior art use of CDs with magazines, TV Guide is "entitled to rely" on this "public record of the patentee's claim." *Vitronics*, 90 F.3d at 1583. To satisfy the "public notice" function of patent prosecution, "competitors are entitled to review the public record, apply the established rules of claimed invention." *Id.*

A CD or similar media attached to a magazine is not a "label" as recited in the asserted claims, particularly a magazine which already has its name (and other identifying information) clearly printed on the magazine itself. *See, e.g.,* (Statement of Facts ¶ 30). The CD is also not a "second label" for the product. The CDs and DVDs attached to the TV Guide issues all included promotional audio and/or video content and did not function as labels. Each and every accused issue of the TV Guide magazine includes the name of the magazine prominently presented on the cover of the magazine, and all indentifying or related information that is normally included with TV Guide issues *not* having CDs, was still included with the magazine covers or on the inside of the magazine covers. Thus, in no instance was the CD or DVD acting as a "label" as contemplated by the '332 Patent.

The CDs and DVDs attached to the TV Guide magazines do no more than the prior art magazines which Etagz has excluded from the definition of a "label." Therefore, if TV Guide's

magazines with the attached CDs and DVDs were to be held within the scope of the term "label," the prior art magazines and attached computer readable media would read on the limitations of all of the claims, rendering the '332 Patent invalid.

Since each and every claim of the '332 Patent require a "label," (as do all of the new claims that will be part of the '332 Patent pursuant to the expected reexamination certificate) Etagz cannot establish that the accused products satisfy each and every element of any of the claims. Accordingly, TV Guide cannot infringe the '332 Patent and Etagz' lawsuit must be dismissed. *See Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985); *Warner-Jenkinson Corp. v. Hilton Davis Corp.*, 520 U.S. 17, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)*; Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999).[7]

**B.     TV Guide's use of CDs and DVDs to provide additional content to the purchaser cannot infringe the '332 Patent because the practice existed in prior art examples considered by the USPTO**

A century-old axiom of patent law holds that a product "which would literally infringe if later in time anticipates if earlier." *Schering Corp. v. Geneva Pharms., Inc.,* 330 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d 1368, 1378 (Fed. Cir. 2001)); *accord, Peters v. Active Mfg. Co.,* 129 U.S. 530, 537 (1889) ("That which infringes, if late, would anticipate, if earlier."). In other words, if TV Guide's conduct infringes the '332 Patent, the patent must be invalid as it would cover what was practiced in the prior art. However, the USPTO examiner instead found that the prior art CDs or computer-

---

[7] Further, a finding of direct infringement of an independent claim *(i.e,* claim 1, 26, 29, 31, 37 or 47) is required before TV Guide can be found to have infringed any dependent claim therefrom (*i.e,* claims 2-10, 27-28, 30, 32-36 and 38-46). *Monsanto Company v. Syngenta Seeds, Inc*., 503 F.3d 1352, 1359 (Fed. Cir. 2007), *citing Wahpeton Canvas Co., Inc. v. Frontier, Inc*., 870 F.2d 1546, 1552 (Fed. Cir. 1989).

readable media attached to magazines and books were not "labels" within the meaning of the invention claimed by Etagz and did not, therefore, anticipate and invalidate the invention.

The TV Guide magazines and attached CDs/DVDs were both part of the same product that was purchased at the newsstand. In other words, the alleged "label" formed part of the product, such that they were not separate and distinct, which according to Etagz is a requirement of the term "label." *See* (Statement of Facts ¶ 52) ("'[A] label' is distinct and separate from a 'product.'"); *see also* (Statement of Facts ¶ 54) ("Neither the label nor computer readable medium can be the 'product,'"). For example, the TV Guide magazines did exactly what was taught by the prior art '494 Patent, which taught that "disk products [may be] marketed in conjunction with documentation, instruction manuals, a companion book product, catalogs or other related conventional paperbound printed materials." (Statement of Facts ¶ 59).

The TV Guide magazines and accompanying CD product with related content is analogous to the example provided in the prior art '494 Patent. In that case, a paperbound atlas of North America was marketed with a related CD that was packaged such that the CD was viewable to the purchaser. Etagz distinguished their invention over the '494 Patent by characterizing the CD-ROM of the '494 Patent as being "a product, not a label" (Statement of Facts ¶ 61). Etagz further stated that "the Patent Owner did not find any suggestion in Taplin that the disclosed disk would act as a label for the product. The disk in Taplin is not a label." (Statement of Facts ¶ 62).

Here, just like the jointly marketed printed publication and CD of the '494 Patent, each accused issue of TV Guide's magazine and attached CD/DVD include related content such that they are not separate and distinct. In each case, the content on the CD/DVD was related to the content of the printed magazine. For example, the printed content of the August 2006 issue of

TV Guide magazine included a feature story about the TV show LOST. Likewise, the CD-ROM included with that issue included content related to the TV show "LOST" that was described as "Never Before Seen Footage!" and "Plus Season 3 Preview!" The content of the CD-ROM, therefore, was directly related to the content of the particular issue, which was also identified on the cover of the issue. Therefore, both the print content of the magazine and the digital content of the magazine formed part of the total content as companion products that were jointly marketed and purchased by buyers. Furthermore, the purchase price for the TV Guide magazine was greater for issues that included the digital content. (Statement of Facts ¶ 68) [Kain Decl. ¶ 25]. This practice of increasing the price of the combined product was taught long before the '332 Patent was filed. (Statement of Facts ¶ 28) ("Although tagged as 'free', covermount discs sometimes increase the price of the magazine."). Such an increased price for magazines that included the attached CD further indicates that the CD was a companion product with the magazine, rather than acting as a label for the magazine.

Therefore, the combination of the printed magazine and the CD/DVD constitutes the product distributed by TV Guide. The CD/DVD attached to the TV Guide magazines is not a label. As discussed herein, discs that are attached to magazines, like TV Guide's accused products, have been excluded by Etagz and the USPTO from the definition of a label.

**C.** **Etagz' Claim Of Infringement Of Claims 1, 26 And 29 And Dependent Claims Therefrom Must Be Dismissed Because They Require Joint Infringement By More Than One Party**

Direct infringement by "use" of a system claim requires a party to use each and every element of the claimed system. *Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d

1279, 1284 (Fed. Cir. 2011). A "use" of the system must put the claimed invention into service, *i.e.* control the system and obtain a benefit from it. *Id*., at 1286.

Claims 1 and 29 include claim limitations which would be satisfied only by a party other than TV Guide. Thus, TV Guide cannot directly infringe these claims. For example, claim 1 requires both "a first computer associated with a user and containing a first processor" and "a second computer associated with a vendor and containing a second processor." Even assuming for purposes of summary judgment, that TV Guide has a "computer associated with a vendor and containing a second processor," it does not also have "a first computer associated with a user [purchaser] and containing a first processor" as required by claim 1 of the '332 Patent. Claim 1 requires two parties to complete the claims – a user [purchaser] and a vendor. Similarly, claim 29 of the reexamined '332 Patent requires "a first computer, associated with a user and containing a first processor." [Burton Decl., Exh 18, at 3] These elements would be satisfied by a party other than TV Guide. Thus, TV Guide cannot directly infringe these claims.[8]

TV Guide does not control or direct the actions of purchasers of its magazines and therefore cannot be found vicariously liable for infringement of claims 1 or 29. *Centillion Data Sys.*, 631 F.3d at 1287 (citing *BMC*, 498 F.3d. at 1379). In *Centillion,* Qwest was accused of infringing Centillion's patents. The accused products included two parts a back-office system controlled by Qwest and a front-end client application controlled by the customer. *Id.* at 1282. The Federal Circuit held that Qwest did not use the claimed system because it did not "put the claimed invention into service" because "it never puts into service the personal computer data

---

[8] This is very likely the reason Etagz did not assert these claims in its original (Docket 1), First Amended Complaint (Docket 28), or Second Amended Complaint (Docket 38), but asserted only claims 11 and 16. It was only after originally asserted claims 11 and 16 were invalidated in the reexamination proceeding that Etagz indicated it would assert claims 1 and 26, and new claim 29.

processing means [of the customer]. Supplying software for the customer is not the same as using the system" *Id.* at 1286. The Federal Circuit determined that Qwest could not be found vicariously liable for the actions of its customers because "Qwest in no way directs its customers to perform nor do its customers act as its agents. While Qwest provides software and technical assistance, it is entirely the decision of the customer whether to install and operate this software on its personal computer data processing means." *Id.* at 1287.

Similarly, in this case, no evidence exists that TV Guide directed or could direct its customers to perform any steps required by the patent claims (or any steps at all). TV Guide's customers do not act as agents for TV Guide and are not controlled by TV Guide. TV Guide created the media in question as a bonus item for its magazine purchasers, and the customers use of the media was purely voluntary. The customers were never under the control or agency of TV Guide, and the customer was free to ignore the media, without consequence. Thus, no vicarious liability arises as between TV Guide and its customers. *Id.*

For process or method patents, infringement occurs only when a party performs all the steps of the claimed process. *BMC Resources Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007). Claim 26 of the '332 Patent is a method claim that requires a step of "reading that computer reading medium" by "the user computer associated with the purchaser." (Burton Decl., Exh. 1). This step would be performed by the user, not TV Guide. It is undisputed that TV Guide does not perform every step of claim 26 of the '332 Patent. As stated, TV Guide's customers were never under the control or agency of TV Guide. Accordingly, TV Guide cannot infringe claim 26. *Id.*

**D. Etagz' Cannot Assert Infringement Against TV Guide Based on New Claims Added To The '332 Patent During The Reexamination**

TV Guide published its last accused magazine on August 11, 2008. (Statement of Facts ¶ 66). New claims 29, 31, 37 and 47 were each added on December 23, 2010 after a reexamination proceeding which was initiated on September 20, 2010. (Statement of Facts ¶ 33). The new claims were approved by the examiner on April 8, 2011 (Burton Decl., Exh. 19). The reexamination certificate that will make the claims enforceable has not even yet issued. In other words, the accused infringing activities all took place long before claims 29, 31, 37 and 47 were even proposed by Etagz, and they cannot now be used to find TV Guide guilty of infringement years ago.

New or amended claims from a reexamined patent must be identical to the claims of the original patent; otherwise intervening rights protect the accused infringer from claims of infringement. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342 (Fed. Cir. 1998) *citing* 35 U.S.C. § 252; 35 U.S.C. § 307(b). If the reexamined claims are not identical, "the patentee is entitled to infringement damages only for the period *following* the issuance of the reexamination certificate. *See Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247, 1249-50, 44 U.S.P.Q.2D (BNA) 1859, 1861 (Fed. Cir. 1997) (emphasis supplied). Here the reexamination certificate has not yet even issued.

The four new independent claims are not substantially identical. The new claims each include additional elements and limitations which render the reexamined claims narrower in scope than the original claims (11 and 16) of the '332 Patent. It is axiomatic that adding new limitations substantially changes the scope of the claims. *Pandora Jewelry, LLC v. Chamilia, LLC*, 2008 U.S. Dist. LEXIS 61064 at *34–*37 (D. Maryland 2008). All of the original claims

remain pending in the '332 Patent reexamination while the new independent claims (which include numerous new limitations) have been indicated as allowable. It is nonsensical to suggest that the scope of a rejected claim is identical to an issued claim. *See, e.g., Laitram*., 163 F.3d at 1348.

Additionally, under the doctrine of claim differentiation, every claim in a patent must have a different scope. *See* 37 C.F.R. §1.75. Specifically, a patent may include more than one claim, but only *if they differ substantially from each other.*" 37 C.F.R. §1.75(b). As new claims 29 through 51 were added without cancelling any original claim, it follows that the new claims must differ in scope and therefore are not substantially identical to the original claims. As the scope of the newly added claims is not identical to the claims as originally published in the '332 Patent, Etagz is not entitled to recover any damages for activities occurring before the issuance of a reexamination certificate.

## IV.    CONCLUSION

For the reasons stated herein, the Court should grant TV Guide's Motion for Summary Judgment of Non-Infringement.

DATED this 1st day of February, 2012.

    __/s/ H. Dickson Burton_____
    H. Dickson Burton
    Krista Weber Powell
    Edgar R. Cataxinos
    Steven W. Gutke
    TRASKBRITT, PC
    230 South 500 East
    P.O. Box 2550
    Salt Lake City, UT  84110
    Telephone:  (801) 532-1922

    Attorneys for Defendant TV Guide
    Magazine, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of February, 2012, a true and correct copy of

the foregoing was served upon the following via the Court's ECF System:

Joseph Pia, Esquire
PIA ANDERSON DORIUS REYNARD & MOSS
222 S. Main Street, Suite 1830
Salt Lake City, UT 84101

Counsel for Plaintiff Etagz, Inc.

David M. Bennion
PARSONS BEHLE & LATIMER
201 S. Main St., Suite 1800
PO BOX 45898
Salt Lake City, UT 84145-089

Counsel for Defendant Flambeau, Inc.

Anthony A. Tomaselli
Josephine K. Benkers
Martha Jahn Snyder
Matthew J. Duchemin
QUARLES & BRADY LLP (WI)
33 E MAIN ST STE 900
MADISON, WI 53703

Counsel for Defendant Flambeau, Inc.