Joseph Pia (9945)
PIA ANDERSON DORIUS REYNARD & MOSS, LLC
222 South Main Street, Suite 1830
Salt Lake City, Utah 84101
Telephone:  (801) 350-9000
Facsimile: (801) 350-9010
E-mail: joe.pia@padrm

*Attorneys for Plaintiff*

---

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ETAGZ, INC.,<br><br>      Plaintiff,<br><br>   v.<br><br>FLAMBEAU, INC., a Wisconsin corporation, and TV GUIDE MAGAZINE, a Delaware limited liability company,<br><br>      Defendants. | **PLAINTIFF ETAGZ, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT TV GUIDE MAGAZINE, LLC'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT** |
| FLAMBEAU, INC., a Wisconsin corporation, and TV GUIDE MAGAZINE, a Delaware limited liability company,<br><br>      Counterclaim Plaintiffs,<br>   v.<br><br>ETAGZ, INC.,<br><br>      Counterclaim Defendant. | Civil No.: 2:10-cv-00240-BSJ<br><br>Judge Bruce S. Jenkins |

Plaintiff and Counterclaim Defendant Etagz, Inc. ("Etagz"), by and through counsel Pia

Anderson Dorius Reynard & Moss, and pursuant to Rule 56 of the Federal Rules of Civil

Procedure and DUCivR 7-1(b)(l) and 56-1, respectfully submits this Memorandum in Opposition to Defendant and Counterclaimant TV Guide Magazine, LLC's ("TV Guide") Motion for Summary Judgment of Non-Infringement ("Motion").

I.   **INTRODUCTION**

TV Guide attempts to misguide this Court through a loose, and largely inaccurate analysis of what is taught as a "label" under the '332 Patent.  In fact, TV Guide almost completely avoids citing direct language from the '332 Patent – language which is not only applicable, but controlling on the determination of what constitutes a label.  The allegation that "magazines have been sold with CDs and other computer readable media since at least 1984," as cited in TV Guide's Motion, has no effect on Etagz's infringement claims against TV Guide because such CDs are not labels as defined by the '332 Patent.  When the United States Patent and Trademark Office ("PTO") considered that certain magazines with CDs attached were non-labels, it was because they did not meet each and every element of the '332 Patent's "label." While TV Guide would have this Court believe that a label is merely any CD attached to a book or magazine, the definition of a label under the '332 Patent is more restrictive, as set forth below.

It is this more complex definition of label that has caused the invention of the '332 patent to survive extensive prosecution with the United States Patent Office, overcome thousands of pages of prior art, and an in-depth re-examination proceeding instigated by the Defendants themselves.  By its over-simplification of the term "label," TV Guide invites the Court to engage in a convenient, yet incorrect evaluation process.

By way of summary, the '332 Patent invention, entitled "CD-ROM Product Label Apparatus and Method," relates to product labeling and, more particularly, to novel systems and

methods for providing electronic feedback and user information by registration with vendors of products.  The '332 Patent, Column 1: 6 – 9, attached hereto as **Exhibit A**.  Specifically, the invention is a system and a method for enabling a comparatively long-term relationship to exist between a supplier, manufacturer, vendor of goods or services, and the consumer, purchaser, or user of the same.  Exh. A, Column 1: 25 – 29.  That relationship is established through the invention, which is an apparatus and method for interactively identifying product or purchasing information, marketing and preference information, for ready provision of the same to a purchaser and to a vendor upon request and authorization.  *Id.*, Column 1: 46 – 50.

For TV Guide to succeed on its non-infringement claim, it must demonstrate that its accused products do not meet the elements of the claims in the '332 Patent that define the invention, or the "label" itself.  For example, while computer-readable media attached to a magazine may not have been novel in 1999, as cited in TV Guide's Motion, computer-readable media attached to a magazine that establishes an interactive relationship by identifying and recording product or purchasing information, marketing and preference information, facilitating interactivity between the purchaser and the vendor, and providing the same to a purchaser/ vendor did not, in fact, exist in 1999.  The forgoing are part of the term "label."  TV Guide has failed to distinguish its accused products from the same.  Furthermore, TV Guide's characterization of its infringing CDs and DVDs as merely "promotional items" is of no consequence.  The '332 Patent's coverage is unaffected by whether the infringer styles its CD as containing, or not containing, promotional media.

TV Guide's reference to Etagz's originally asserted claims 11 and 16 is neither instructive nor significant.  While both claims have been rejected upon reexamination and are

currently on appeal, Etagz has moved this Court for a dismissal of its allegations regarding claims 11 and 16 from the action.  On December 9, 2011, Etagz voluntarily agreed to dismiss the appealed claims to expedite moving the case forward.  In turn, TV Guide requested their dismissal with prejudice.  However, the Court refused to require a dismissal with prejudice.  The reasons include that Defendants pushed the '332 patent into reexamination *ex parte*, and consequently are charged with the consequences of that ultimate result.  In accordance with Etagz's agreement to dismiss claims 11 and 16 without prejudice, Etagz filed a motion to dismiss both claims.  However, in an attempt to side-step the Court's refusal to require Etagz to dismiss its claims with prejudice, Defendants opposed the motion on largely inapplicable grounds.  Were it not for Defendants' opposition, the disposition of claims 11 and 16 would not be an issue in this case.

Etagz's consistent position is that TV Guide infringes claims 1 through 26 of the '332 Patent (now excluding claims 11 and 16 for the reasons stated above).  Additionally, Etagz intends is asserting additional  independent claims 29, 31, 37 and 47 that were issued as a result of Defendants reexamination proceeding.  The Court will recall that the case was interrupted and stayed for six (6) months during this process.  The possibility that reexamination could result in the issuance of new claims **over** Defendants' prior art is a risk that Defendants' knowingly undertook.

Etagz's assertion of its newly added claims against TV Guide is proper as the effective date of the same claims relates back to the date the '332 patent was issued.

Finally, TV Guide misunderstands the relationship in claims 1 through 26, and new claim 29, between a purchaser and a vendor.  All that is required for infringement is that a connection,

*i.e.*, an Internet connection, be established where information from a purchaser can be transferred to a vendor and vice-versa.  Each of TV Guide's eight infringing CDs or DVDs provides either software or programming that allows a purchaser to connect with TV Guide or an affiliate through a direct link on computer-readable media to TV Guide's website or server.  Therefore, the requirement that infringement of claims 1 through 26 and 29 requires more than one party has been satisfied by TV Guide's accused products.

For these reasons, summary judgment of non-infringement is inappropriate and should not be granted.

//.

II.     **ETAGZ'S RESPONSE TO TV GUIDE'S STATEMENT OF FACTS**

TV Guide's Motion sets forth seventy-six (76) numbered paragraphs under a section heading that suggests that the paragraphs contain undisputed material facts relevant to the determination of whether the CDs attached to TV Guide's accused products are "labels" in violation of the '332 Patent.  However, the paragraphs provide none of the facts that are most material to that determination.  Rather than providing the pertinent language from the '332 Patent regarding what <u>constitutes</u> a label, TV Guide focuses on examples of what <u>does not</u> constitute a label as provided during the prosecution of a different patent, issued ten (10) years later: the '686 Patent.  It is legal error to impute limitations from a later issued patent on an earlier patent.

Not only was the '686 Patent issued years after the '332 Patent, but Etagz stipulated, and TV Guide acknowledge in its Motion, to withdraw all of its claims against TV Guide related to the '686 Patent.   The '686 Patent no longer is part of this litigation, yet TV Guide proceeds to cite example after example from the '686 Patent's prosecution history as controlling on the question of whether or not TV Guide's magazines infringe the '332 Patent.

TV Guide would also have this Court believe that its accused products teach the same definitions, claims, and limitations as several unrelated patents and prior art presented and distinguished by the PTO from the '332 Patent as a basis for its allegation that it does not infringe the '332 Patent.  However, an in-depth review of pertinent portions of the '332 Patent's prosecution history (rather than '686 patent prosecution history) with regard to what constitutes a label will show that the CDs attached to TV Guide's accused magazines <u>do</u> satisfy the elements set forth in the '332 Patent's definitions, claims, and limitations of a label.

Etagz objects to and disputes each of TV Guide's enumerated paragraphs to the extent that the statements in those paragraphs comprise conclusive characterizations and statements of opinion that are not fact.

Etagz responds further to TV Guide's enumerated paragraphs as follows:

**A.     The Patents-In-Suit and the Prosecution History**

1.      Undisputed that the '332 Patent, entitled "CD-ROM Product Label Apparatus and Method," issued on October 2, 2000 from an application filed May 6, 1999 by inventor David R. Montague.

2.      Undisputed that Etagz claims ownership of the '332 Patent through assignment.

3.      Undisputed that U.S. Patent No. 7,703,686 (the "686 Patent"), entitled "Consumer-Computer-Readable Label Apparatus and Method," issued on April 27, 2010 and matured from an application filed July 9, 2009.  **Disputed** that the '686 Patent prosecution history controls (which patent was issued 10 years later) or is otherwise instructive on whether or not TV Guide has infringed the '332 Patent.

4.      Undisputed that Etagz asserted the '686 Patent against TV Guide in its Second Amended Complaint filed on June 4, 2010.  Undisputed that on October 25, 2010, based on Etagz's stipulation, the Court dismissed Etagz's infringement claims against TV Guide with respect to the '686 Patent.

5.      Undisputed that the '686 Patent is part of the '332 Patent family.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the prosecution history of the later issued '686 Patent, as cited throughout the Motion, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent.

6.     Undisputed that the '686 Patent is a continuation of U.S. Patent No. 7,503,502, which is a continuation of another patent application (serial number 04/488,079), which is a continuation-in-part of the '332 Patent.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the prosecution history of the '686 Patent, as cited throughout the Motion, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent.

7.     Undisputed that the front page of the '686 Patent shows a box drawn around the "Related U.S. Application Data" to show the direct relationship between the '686 Patent and the '332 Patent as being part of the same patent family.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited throughout the Motion, does not limit the definition of "label" under the '332 patent, and in what circumstances a CD/DVD attached to a magazine fulfills the elements resulting in infringement.

8.     Undisputed that the figure shown in this paragraph shows a direct relationship between the '686 Patent and the '332 Patent as being part of the same patent family.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited throughout the Motion, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent.

9.     Undisputed that the '332 and '686 Patents both describe the invention of this family of patents as follows: "[t]his invention relates to product labeling and, more particularly, to novel systems and methods for providing electronic feedback and user information by registration with vendors of products."

10. Undisputed that every claim of the '332 Patent requires (as does the '686 Patent), either directly or by dependency, a "label" comprising or integrated with a computer-readable medium.

11. **Disputed** that the '332 Patent only discusses the claim term "label" in passing. For example, as recognized by TV Guide, the Patent is titled "CD-ROM Product Label Apparatus and Method." Also, the "Abstract" section provides, "A CD-ROM provides all or part of a product labeling system for engaging purchasers. Executables, data, or both are recorded on a CD-ROM hang-tag or other product labeling structure in order to deliver to a consumer or purchaser engaging presentations of product information or registration templates." Additionally, the "Brief Summary and Objects of the Invention" section provides, "[I]t is a primary object of the present invention to provide a compact disc product label providing a link back from a purchaser to a vendor. In certain embodiments, an apparatus and method in accordance with the invention may provide operational data, executables, linking information, suitable software, templates, and the like for facilitating an exchange of information between vendors and purchasers." The foregoing examples provide specific and detailed information regarding the term "label" as contemplated by the '332 Patent.

12. Undisputed that Figure 3 of the '332 Patent is shown in this paragraph.

13. Undisputed that Figures 11, 12, and 13 of the '686 Patent are shown in this paragraph. **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited throughout the Motion, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent as described, for example, in paragraph 11 above.

14.     Undisputed that during the prosecution of the '332 Patent, the examiner rejected the then pending claims as obvious based, in part, on U.S. Patent No. 5,825,292 to Tsai et al., entitled "Electronic Article Surveillance for Direct Application to Optically Recorded Media," as well as on certain other patents.

15.     Undisputed that in response to the examiner's rejection, Etagz argued that "Tsai appears to teach the product as the computer-readable medium, as compared to the label as the computer-readable medium in the claimed invention."

16.     Undisputed that in Etagz's November 20, 2000 Amendment and Response, Etagz explained further:

> Display, promotional, and direct-mail labels limit the vendor to dissemination of general, broad information regarding the products and services.  Labels associated with a particular product allow dissemination of very broad vendor related information as well as particular product specific information.

17.     Undisputed that during the prosecution of the '686 Patent, the examiner made the following statement in a September 14, 2009 Office Action:

> In not making an art rejection . . . on claims 1 and 16, the examiner notes the following understanding of the claims, in accordance with [the inventor's] own specification and remarks on the record.
> . . .
> [A] 'label' would not be a term used to describe just any accompanying CD that is often included in a sleeve of a book such as a textbook or a children's book.  In general, these accompanying CDs attached to books, while meeting other limitations present in the claims, do not act as a label for the book.

**Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited throughout the Motion, is not controlling on determining in what circumstances CDs attached to magazines constitute "labels" under the '332 Patent. Furthermore, the September 14, 2009 Office Action for the '686 Patent *generally* addressed CDs

attached to books (not magazines) and other limitations required to satisfy the claims of that particular patent, whereas the 'Z332 Patent comprises detail with regard to what constitutes a label for infringing **its** claims as outlined in paragraph 11 above.

18.    Undisputed that in that same Office Action, the examiner stated "[t]he prior art made of record and not relied upon is considered pertinent to applicant's disclosure.  Koehn (US 6,068,117) and Pace et al. (US 6,126,201) are noted."  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the 'Z686 Patent, as cited throughout the Motion, is not controlling on whether CDs attached to magazines are "labels" under the 'Z332 Patent as described, for example, in paragraph 11 above.

19.    Undisputed that U.S. Patent No. 6,068,117 to Koehn (the "'117 Patent"), entitled "Book Insert CD Carrier Device," and filed with the United States Patent and Trademark Office on July 14, 1999, states that "[t]he present invention generally relates to a book insert and, more particularly, to a book insert having one or more pockets for carrying compact discs."  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the 'Z686 Patent, from which the reference in this paragraph to the '117 Patent originates, is not controlling on whether CDs attached to magazines are "labels" under the 'Z332 Patent as described, for example, in paragraph 11 above.

20.    Undisputed that U.S. Patent No. 6,126,201 to Pace, et al. (the "'201 Patent"), entitled "Folder for Binding and Mailing Compact Discs," and filed with the United States Patent and Trademark Office on January 6, 1998, states that "[t]he present invention relates generally to compact disc folders, and more particularly, to an improved, bindable compact disc folder that can be easily bound into a publication, such as a magazine as well as mailed separately."

**Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, from which the reference in this paragraph to the '201 Patent originates, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent as described, for example, in paragraph 11 above.

21.     Undisputed that the '201 Patent states that "[i]n the computer arts, many major computer-related magazines such as BYTE, PCWORLD and others, supply CD-ROMS to their subscribers with certain magazine issues." **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, from which the reference in this paragraph to the '201 Patent originates, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent as described, for example, in paragraph 11 above.

22.     Undisputed that in Etagz's December 14, 2009 Response to the September 14, 2009 Office Action regarding the '686 Patent, Etagz did not contest or contradict the examiner's characterization of the scope of the claim language.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited throughout the Motion, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent as described, for example, in paragraph 11 above.

23.     Undisputed that in connection with its prosecution of what became the '686 Patent, on December 14, 2009, Etagz filed an Information Disclosure Statement listing several new references, including two Wikipedia entries – "PC Gamer" (http://en.wikipedia.org/wiki/PC_Gamer),                     and                     "Covermount" (http://en.wikipedia.org/wiki/Covermount) - as well as a website entitled "Old CD Magazines/Magazine CDs for download" from the website "VOGONS" (Very Old Games On

New Systems) (http://www.vogons.zetafleet.com/viewtopic.php?p=168435).  **Disputed** that this

fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited

throughout the Motion, is not controlling on whether CDs attached to magazines are "labels"

under the '332 Patent as described, for example, in paragraph 11 above.

24.     Undisputed that the "PC Gamer" reference submitted by Etagz in the December

14, 2009 Information Disclosure Statement regarding the '686 Patent states, among other things:

> The British edition of PC Gamer has been in constant monthly publication since
> 1993 . . . The magazine originally shipped with an accompanying 3.5-inch (89
> mm) floppy disk.  A CD demo disc (labeled [*sic*] CD Gamer) was released
> alongside the floppy disk edition from issue 11 onwards with the first CD Gamer
> containing all the content from the previous 10 issues' floppy disks . . .

**Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the

'686 Patent, from which the reference in this paragraph to PC Gamer originates, is not

controlling on whether CDs attached to magazines are "labels" under the '332 Patent as

described, for example, in paragraph 11 above.

25.     Undisputed that the images provided in this paragraph are from the 1997 June

Issue of PC Gamer Magazine.  **Disputed** that this fact is important in deciding the merits of TV

Guide's Motion because the '686 Patent, from which the reference in this paragraph to PC

Gamer originates, is not controlling on whether CDs attached to magazines are "labels" under

the '332 Patent because the '686 Patent and its prosecution history are inapplicable to that

determination.

26.     Undisputed that the PC Gamer Magazine has the "PC Gamer" logo featured

prominently on the face of the magazine as a label for the magazine.  Undisputed that the

accompanying CD has the "PC Gamer" logo printed on its face, which is attached to, and visible

from, the front cover of the magazine.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, from which the reference in this paragraph to PC Gamer originates, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent because the '686 Patent and its prosecution history are inapplicable to that determination.

27.     Undisputed that the "Covermount" reference submitted by Etagz in the December 14, 2009 Information Disclosure Statement regarding the '686 Patent states:

> Covermount (sometimes written *cover mount*) is the name given to storage media (containing software and/or audiovisual media) or other products (ranging from toys to flip-flops) packaged as part of a magazine or newspaper.  The usual method of packaging is to place the media or product in a transparent plastic sleeve and mount it on the cover of the magazine with adhesive tape or glue, hence the name.

Undisputed that this reference also states that the practice of Covermount dates back to at least 1984.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, from which the reference in this paragraph to Covermount originates, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent because the '686 Patent and its prosecution history are inapplicable to that determination.

28.     Undisputed that the Covermount reference further states that "[a]lthough tagged as 'free', covermount discs sometimes increase the price of a magazine.  Magazines that carry discs can cost as much as double the price of other magazines without them."  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, from which the reference in this paragraph to Covermount originates, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent because the '686 Patent and its prosecution history are inapplicable to that determination.

29.     Undisputed that the "Old CD Magazines/Magazine CDs for download" page shows "old CD magazines . . . from 1994-6," including the December 1994, June 1995, July 1995, and October 1995 issues of PC Gamer.  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, from which the reference in this paragraph "Old CD Magazines/Magazine CDs for download" originates, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent because the '686 Patent and its prosecution history are inapplicable to that determination.

30.     Undisputed that in the Notice of Allowance dated February 23, 2010, indicating that the '686 Patent was going to be allowed to issue, the examiner stated:

> It is noted [that] a label is a medium which is attached to a product to indicate information about that product to which it is affixed, an aspect which is expressly claimed.  It would not for instance typically include software attached to say, a book (even if the software has on it information in common with the book) because that software is not a label of the book per se.  The book, or magazine or other media that commonly has included software does not need a label, for it has the relevant information directly printed on it.  A CD attached to a book is therefore not considered a label for the book.

**Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited throughout the Motion, is not controlling on whether CDs attached to magazines are "labels" under the '332 Patent as described, for example, in paragraph 11 above.

31.     Undisputed that in Etagz's March 3, 2010 Response to Notice of Allowance regarding the '686 Patent, Etagz stated that "[i]t is agreed that the limitations recited in the examiner's Reasons for Allowance are not taught or suggested by the art of record, and that the allowed independent claims are distinguished from the cited prior art for at least the reasons stated in the Reasons of Allowance."  **Disputed** that this fact is important in deciding the merits of TV Guide's Motion because the '686 Patent, as cited throughout the Motion, is not controlling

on whether CDs attached to magazines are "labels" under the '332 Patent because the '686 Patent and its prosecution history are inapplicable to that determination.

**B.     Reexamination**

32.     Undisputed that in Etagz's Second Amended Complaint in this matter, Etagz asserted infringement of claims 11 and 16 against TV Guide and Flambeau.

33.     Undisputed that on or about September 30, 2010, Defendant Flambeau filed a third party request for a reexamination proceeding with respect to claims 11 and 16 of the '332 Patent.

34.     Undisputed that during the reexamination proceeding, No. 90/011,244, Etagz added new claims 29 through 51.

35.     Undisputed that in Etagz's December 23, 2010 Owner's Statement of the Reexamination, Etagz cited additional prior art for a webpage printout showing the cover and cover tape for the magazine Your Sinclair, October 1987, Issue 22; and a copy of the first six pages of the magazine Mojo, August 1997, Issue 45.

36.     Undisputed that the images in this paragraph were provided to the examiner by Etagz.

37.     Undisputed that the copies of the images in paragraph 36 show that Mojo magazine has the "Mojo" name displayed on the top portion of the magazine cover, but disputed that the same name displayed at the top constitutes a label for the magazine as taught by the '332 Patent.  Undisputed that the phrase "Free CD" appears at the bottom left-hand corner of the magazine, but disputed that the same phrase serves as an identification of the CD.  Undisputed that the CD has the name of the magazine "Mojo the Music Magazine" printed on the face of the

CD, which is also viewable from the front of the magazine.  Undisputed that the content of the CD includes a music single that is related to the 100 Greatest Singles content contained in the Mojo magazine, but disputed that the same CD constitutes a "label" as taught by the '332 Patent and as further described in paragraph 11 above and paragraph 38 below.

38.     Undisputed that in the April 8, 2011 Non-Final Office Action for the '332 Patent, the examiner explained that "it is <u>not</u> agreed that the consideration of Mojo magazine proposed by the Third Party requester raises a substantial new question of patentability . . . Mojo discloses a product 'Mojo magazine' and a 'Free CD' inserted in the magazine containing several songs, and said 'Free CD' are distinct and separate.  However, Mojo magazine does not suggest the teaching . . . 'providing a label'."

39.     Undisputed that on September 20, 2010, Defendant Flambeau filed an Information Disclosure Statement listing several new references, including U.S. Patent No. 5,950,401 to Blohm, et al. (the "401 Patent"), entitled "Method of Producing a Printed Product Having a Packaged Compact Disc.

40.     Undisputed that the '401 Patent states:

> Due to the relatively recent surge in computer popularity, companies have begun using computer disks to convey information to potential customers.  For example, some companies provide potential customers with computer disks that give textual and pictorial information about the company's products.  In addition, computer disks can accompany an owners' manual to convey to the consumer information about the use of the product.  The ability to store large amounts of information makes CD-ROMs particularly useful in conveying information to consumers for these purposes.

**Disputed** that TV Guide's magazine-attached CDs meet the description of the claims and limitations of the '401 Patent, but undisputed that the same CDs satisfy the elements of a "label" as defined in the '332 Patent.

41.     Undisputed that the '401 Patent further states:

One way of packaging and sending computer disks to consumers is to attach the
computer disk to a printed publication, such as a magazine.  In this manner, the
computer disk could be sent at bulk rate magazine costs, which are significantly
cheaper than direct mail costs.  In addition, the disks can be targeted to the
specific consumers that receive the particular publication.  For example, a CD-
ROM that advertises expensive luxury automobiles could be attached to an
automotive magazine, or possibly to a magazine directed to wealthier individuals.
Further, utilizing the present invention, computer disks can be attached directly to
an owners' manual, thereby safely securing the computer disk in a printed
publication (i.e., the owners' manual) and avoiding the need for extra packaging
for the disk.

**Disputed** that TV Guide's magazine-attached CDs meet the description of the claims and

limitations of the '401 Patent, and disputed that the '401 patent description satisfies the elements

of a "label" as defined in the '332 Patent to the extent that it does not disclose or meet all of the

limitations in the '332 patent's definitions as set forth below.

42.     Undisputed that in Etagz's December 23, 2010 Owner's Statement of the

Reexamination, Etagz explained that "Blohm discloses a method of producing a printed product,

such as a book or magazine, having a packaged compact disk included within the print product.

The patent owner did not find any suggestion in Blohm that the disclosed disk would act as a

label for the printed product.  Thus, the disk in Blohm is not a label."

43.     Undisputed that in the April 8, 2011 Non-Final Office Action, the examiner

explained that "the computer-readable medium (i.e., said CD-ROM) of Blohm is not the same as

the claimed subject matter 'label' because the computer-readable medium (i.e., said CD-ROM)

would not act as a label for a product."

44.    Undisputed that the reference filed by Defendant Flambeau with the PTO in its September 20, 2010 Information Disclosure Statement listed "'Meet the Pop Twins,' Computer and Video Games Magazine, Oct. 1984, p. 11".

45.    Undisputed that the Computer & Video Games magazine states that the flexi-disc was "attached to the front" of the Computer & Video Games magazine.

46.    Undisputed that an enlarged view of the Computer & Video Games flexi-disc is shown in this paragraph.  Undisputed that the attached flexi-disc has the phrase "Computer & Video Games" and the maker of the game printed on its face, but disputed that the word magazine or the contents of the flexi-disc are printed on its face.

47.    Undisputed that in Etagz's December 23, 2010 Owner's Statement of the Reexamination, Etagz explained that "the Patent Owner did not find any suggestion in CVG that the disclosed disc would act as a label for the magazine product.  The disc in CVG is not a label." **Disputed** that TV Guide's magazine-attached CDs meet the description of the Computer and Video Games Magazine.

48.    Undisputed that in the April 8, 2011 Non-Final Office Action, the examiner explained that "the computer-readable medium (i.e., said flexi-disc for imprinting the program of Spectrum version in the groove) of the CVG is not the same as the claimed subject matter 'label' because the computer-readable medium (i.e., said flexi-disc) would not act as a label for the product."

49.    Undisputed that the examiner further stated in the same Non-Final Office Action that Defendant Flambeau "argues that the flexi-disc is labeled with the title of the magazine and thus, the flexi-disc acts as a label for the CVG magazine.  Even though the flexi-disc includes 'a

special message to *Computer & Video Games* readers,' the flexi-disc essentially including games cannot be understood by one of the ordinary skill in the art as labeling for the product 'CVG magazine' in light of the specification of the '332 Patent."

50.     Undisputed that Defendant Flambeau in its December 14, 2009 Information Disclosure Statement listed "Windows 95, Microsoft, August 24, 1995."

51.     Undisputed that the Windows 95 reference is a windows CD-ROM that includes the Windows 95 operating system.   Undisputed that the Windows 95 CD-ROM displays information regarding the Windows 95 operating system on the face of the CD-ROM, including the manufacturer (Microsoft) of the operating system, but disputed that the CD-ROM provides, or is, a "label" as defined in the '332 Patent.

52.     Undisputed that Etagz's December 23, 2010 Owner's Statement of the Reexamination explained that "'[a] label' is distinct and separate from a 'product.'"

53.     Undisputed that on December 12, 2011, Etagz filed an Appeal Brief appealing the Final Rejection of claims 11 and 16 of the '332 Patent.

54.     Undisputed that in the Appeal Brief of December 12, 2011, Etagz stated that "neither the label nor the computer-readable medium can be the 'product,' since that term has been included elsewhere as part of other limitations.   That is, the 'product' is labeled by the label."

55.     Undisputed that in the Appeal Brief of December 12, 2011, Etagz stated that the Windows 95 CD "did not label the CD-ROM for sale.   In fact, it was not even seen at a point of purchase, but was hidden inside a box with the instructions and packaging."

56.     Undisputed that in the Appeal Brief of December 12, 2011, Etagz further stated

that a "label" is "only for labeling the product and the 'product' is offered for sale, but the label is not offered for sale."

57. Undisputed that Defendant Flambeau's December 14, 2009 Information Disclosure Statement referenced U.S. Patent No. 5,775,494 to Taplin, et al. (the "'494 Patent"), entitled "Floating Disk Product Package with Window Visibility, Secure Containment, and Increased Graphic Surface Area."

58. Undisputed that the '494 Patent states that "FIG. 3B is a top or plan view of a CD-ROM 305 . . . The CD-ROM 305 may be decorated with text messages (not shown) and/or artwork or graphics . . . visible to the consumer through the substantially transparent top lid or outer surface of the inner box." Undisputed that the '494 Patent states that the package may also include "a related book product" within the package.

59. Undisputed that the '494 Patent further states:

The present packaging invention is especially suited but not limited to packaging for disk products marketed in conjunction with documentation, instruction manuals, a companion book product, catalogs or other related conventional paperbound printed materials. A preferred application of the invention is for packaging of one or more CDROMs in conjunction with related printed paperbound books. For example, DeLorme Mapping, Freeport ME 04032, assignee of the present invention, has marketed a joint CDROM and paperbound atlas of North America titled MAP'N'GO (tm). Software titles on CDROM or more traditional disk media typically are packaged with considerable printed documentation by contrast with music CDROMs, for example.

60. Undisputed that FIGS. 4B, 7A, and 7B are shown in this paragraph.

61. Undisputed that regarding Taplin, Etagz stated that "[the] statements from Taplin teach the use of packaging to promote sales of a CD-ROM disk product, the packaging and the product being separate and distinct. The CD-ROM in Taplin is a product, not a label."

62. Undisputed that in the same Owner's Statement, Etagz further stated "the Patent

Owner did not find any suggestion in Taplin that the disclosed disk would act as a label for the product.  The disk in Taplin is not a label."

63.     Undisputed that Etagz's appeal of the rejection of claims 11 and 16 is currently pending before the United States Patent and Trademark Office.

**C.     Asserted Claims**

64.     Undisputed that Etagz asserts that TV Guide infringes claims 1 and 26 of the '332 Patent.  Undisputed that claims 1 and 26 require a "label."

65.     Undisputed that Etagz has indicated that it will assert that TV Guide infringes ***at least*** claims 29, 31, 37 and 47 of the reexamined '332 Patent, and that each of these claims require a "label."   Undisputed that the examiner has identified these claims as "allowable." Undisputed that a reexamination certificate has not yet been issued.

**D.     TV Guide Magazines Including Computer-Readable Media**

66.     Undisputed that TV Guide has included computer-readable media with its magazines on at least eight occasions as follows:  July 4, 2004, May 8, 2005, August 28, 2005, June 5, 2006, August 28, 2006, December 11, 2006, August 13, 2007, and August 11, 2008.

67.     Undisputed that each of TV Guide's magazines included a CD or DVD attached to the cover of the TV Guide magazine.  Undisputed that the TV Guide's name and logo were printed on the upper left hand corner of the front cover of the TV Guide magazine, but **disputed** that the same name and logo can be defined as a computer readable "label" as set forth in the '332 Patent.

68.     Undisputed that with the exception of one of the eight TV Guide issues that included CDs or DVDs (the June 5, 2006 issue), the issues with CDs or DVDs were more

expensive than issues of TV Guide that did not include the CDs and DVDs.  **Disputed** that TV Guide purchasers paid more for the CDs and DVDs themselves, but rather that the same purchasers paid, for example, $0.50 to $1.00 more for the infringing magazine itself that included a CD/DVD that meets the claims and limitations of a "label" as taught by the '332 Patent.

69.    Undisputed that the July 4, 2004 issue ("July 2004 Issue") had two alternative versions, each of which is shown in this paragraph along with an enlarged view of the CD. Undisputed that the face of at least one mini CD includes information related to the Elvis Presley contents of the CD.  **Disputed** as to whether this CD can act as a "label" as construed under the '332 patent.

70.    Undisputed that the May 8, 2005 issue ("May 2005 Issue") had two alternative versions, each of which is shown in this paragraph along with an enlarged view of the CD. Undisputed that the face of the mini CD includes information related to the Elvis Presley contents of the CD.  **Disputed** as to whether this CD can act as a "label" as construed under the '332 patent.

71.    Undisputed that the August 28, 2005 issue ("August 2005 Issue") is shown in this paragraph along with an enlarged view of the CD.  Undisputed that the face of the mini CD includes information related to the LOST television show contents of the CD.  Undisputed that the TV Guide name is shown on the face of the mini CD as a description of the CD as "TV Guide's Audio/Video CD!"

72.    Undisputed that the June 5, 2006 issue ("June 2006 Issue") is shown in this paragraph along with an enlarged view of the DVD.  Undisputed that the face of the DVD

includes information related to the various television show contents of the DVD.  Undisputed that the TV Guide logo is shown on the face of the DVD as a description of the DVD as "FREE DVD from TV Guide."

73.     Undisputed that the August 28, 2006 issue ("August 2006 Issue") is show in this paragraph along with an enlarged view of the CD-ROM.  Undisputed that the face of the CD-ROM includes information related to the LOST television show contents of the CD-ROM. Undisputed that the TV Guide logo is shown on the face of the CD-ROM as a description of the CD-ROM as "Exclusive CD-ROM from TV Guide."

74.     Undisputed that the December 11, 2006 issue ("December 2006 Issue") is shown in this paragraph with an enlarged view of the CD.  Undisputed that the face of the CD includes information related to the Elvis Presley contents of the CD.  Undisputed that the TV Guide logo is shown on the face of the CD as a description of the CD as "Happy Holidays from TV Guide."

75.     Undisputed that the August 13, 2007 issue ("August 2007 Issue") is shown in this paragraph.  Undisputed that the face of the CD-ROM includes information related to the LOST television show contents of the CD-ROM.  Undisputed that the TV Guide logo is shown on the face of the CD-ROM as a description of the CD-ROM as "Exclusive CD-ROM brought to you by TV Guide WAL*MART."

76.     Undisputed that the August 11, 2008 issue ("August 2008 Issue") had two alternative versions, each of which is shown in this paragraph.  Undisputed that the face of the CD-ROM includes information related to the Star Wars Clone Wars contents of the CD-ROM. Undisputed that the TV Guide logo is shown on the face of the CD-ROM as a description of the CD-ROM as "CD-ROM brought to you by TV Guide Toys R Us."

III.    **ARGUMENT**

TV Guide misconstrues the meaning of a "label" as taught by the '332 Patent.  TV Guide's recitation of its facts fails to connect the dots between prior art and patents rejected by the PTO as not containing a label under the '332 Patent, and its own infringing products.  While TV Guide's products may have some elements in common with the rejected prior art, a common occurrence in all patent infringement cases, TV Guide is making an untenable leap that its products are the prior art in order to avoid infringement.  Instead, TV Guide's accused products satisfy every element of what is taught as a label under the '332 Patent.  At this stage of the proceedings, TV Guide has not established the absence of genuine issues of material fact, and is not entitled to summary judgment.

**Legal Standards**

Summary judgment in patent cases is rare and is only granted in the clearest of cases.  *See Strahle v. Dillard's Dept. Stores,* 459 F. Supp. 396, 397 (W.D. Tex. 1978).  Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment should not be granted unless it is clear that a trial is unnecessary.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 255 (1986).

Movants have the burden of proof in their own summary judgment motion to demonstrate the lack of a genuine issue of material fact:

> When the moving party does not have the burden of proof on the issue that is the subject of the summary judgment motion (the patentee bears the burden of proving infringement), the movant nonetheless bears the initial burden of coming forward with sufficient evidence to demonstrate that there is no material issue of

> fact that would preclude summary judgment, and that it is entitled to judgment as
> a matter of law....

*Vivid Technologies, Inc. v. American Science & Engineering, Inc.,* 200 F.3d 795, 806-07 (Fed.

Cir. 1999) (reversing district court's grant of summary judgment of noninfringement).

All reasonable factual inferences must be resolved in favor of Etagz, *see IMS Technology, Inc. v.

Haas Automation, Inc.,* 206 F.3d 1422, 1429 (Fed. Cir. 2000), and "any doubt as to the existence

of any issue of material fact requires denial of the motion." *Omega Engineering, Inc. v. Raytek

Corp.,* 334 F.3d 1314, 1320 (Fed. Cir. 2003).  Even doubts about the presence or absence of a

factual issue must be resolved in Etagz's favor.  *Howes v. Medical Components, Inc.,* 814 F.2d

638, 643 (Fed. Cir. 1987).

   The provisions of 35 U.S.C. § 282[1] create a presumption that each issued United States

patent is valid.  The law further imposes the burden on any challenger to prove invalidity by

clear and convincing evidence.  *Hughes Tool Co. v. Dresser Indus., Inc.,* 816 F.2d 1549 (Fed.

Cir. 1987); *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,* 730 F.2d 1452

(Fed. Cir. 1984).

   To determine whether TV Guide's accused products are covered by the '332 Patent, the

Court must conduct a two-step analysis.  First, the '332 Patent invention, as set forth in the words

of the patent claims, must be clearly understood.  This is a question of claim construction, or

claim interpretation, and it is determined by a court as a matter of law.  *See Markman v.

Westview Instruments, Inc.,* 517 U.S. 370, 386 (1996).  Claim construction is the process of

---

[1] 35 U.S.C. § 282 provides: "A patent shall be presumed valid.  Each claim of a patent
(whether in independent, dependent, or multiple dependent form) shall be presumed valid
independently of the validity of other claims; dependent or multiple dependent claims shall be
presumed valid even though dependent upon an invalid claim.  The burden of establishing

determining the scope of a claim and requires a court to determine the meanings attributed to the terms recited in the claim.  Only after the scope of a claim has been determined can a comparison be made to the accused device or method.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Under the second step of the analysis, the Court must determine whether the claims, as properly construed, embrace the accused products within their scope, *i.e.*, whether the accused device or process meets the requirements of the claims.  *See Hormone Research Foundation v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990).

Thus, as case law makes clear, it is the claims that define the scope of Etagz's right to exclude; it is "the language of the claim [that] frames and ultimately resolves all issues of claim interpretation."  *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997), *amended on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997).  Accordingly, the first source to be examined is the language of the claims themselves.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The words in a claim are "'generally given their ordinary and customary meaning.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citing *Vitronics*, 90 F.3d at 1582; *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) ("Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning.")).  Thus, "[t]he inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."  *Phillips*, 415 F.3d at 1313.

Etagz's asserted claims are not to be interpreted in a vacuum, but should be "read in light of the specification, of which they are a part."  *Markman*, 52 F.3d at 979.  Indeed, "properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Phillips*, 415 F.3d at 1321.  "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id*. at 1313.  The drawings are considered part of the specification.  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1056 (Fed. Cir. 1988).

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."  *Phillips*, 415 F.3d at 1316.  In other words, the inventor is allowed "to be his own lexicographer."  *Vitronics*, 90 F.3d at 1582.  An inventor may define terms either explicitly or by implication.  *Bell Atlantic Network v. Covad Communications*, 262 F.3d 1258, 1270-73 (Fed. Cir. 2001).  "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."  *Vitronics*, 90 F.3d at 1582.  In this manner, the inventor may coin new terms and expressions to communicate the nature of the invention, and may even use words in a manner different from or contrary to the ordinary and customary meaning thereof.

Only after the actual language of the claims in the '332 Patent has been analyzed and the patent specifications consulted, should the prosecution history of the patent be considered.  *See Phillips*, 415 F.3d at 1317.  "Like the specification, the prosecution history provides evidence of

how the PTO and the inventor understood the patent." *Id*. As such, the record before the PTO may shed light on the meaning and scope of the claims. *Vitronics*, 90 F.3d at 1582.

     **A.**     **TV Guide's Accused Magazines Do Include A "Label" as Required By Each And Every Claim.**

TV Guide attempts to misguide the Court by stating that "the Court need not determine a construction of what a 'label' <u>is</u>, so much as what it <u>is not</u>." Motion, p. 4 (emphasis added). Given the controlling nature of the claims language in the '332 Patent itself, it is painfully obvious that the opposite is true –this Court must determine what a "label" <u>is</u> under the '332 patent.

"Label" is not just a term; it comprises a major part of the actual invention itself. TV Guide claims that the '332 Patent only mentions the definition of label in passing. This is false. Each and every asserted claim makes reference to the term "label," and precisely defines what is taught as a label under the '332 Patent. Even a cursory review of Etagz's asserted claims and a comparison with TV Guide's accused products to the same claims demonstrates that TV Guide's accused products, and, therefore, TV Guide, infringes Etagz's '332 Patent:

| Claim Language | Claim Construction | Infringement by TV Guide |
|---|---|---|
| 1. An apparatus comprising: a first computer associated with a user and containing a first processor; | A computer is used to employ the digital label (CD or DVD). | TV Guide's CD/DVD label necessitates a user computer to play the CD/DVD. |
| a second computer associated with a vendor and containing a second processor; | A computer is associated with a vendor. | TV Guide maintains a computer. |
| a label comprising a computer readable medium and adapted to be selectively secured to and removed from a product corresponding to | A computer-readable medium label may be secured to products in any number of ways to designate a source of the products (or indicate a | TV Guide' product includes a CD/DVD label that is secured to the product by a plastic case. The CD/DV corresponds to TV Guide. |

| the vendor and purchased by the user; and | manufacturer, distributor, or seller of the products). | |
|---|---|---|
| the label, further provided with vendor data provided by the vendor and computer readable instructions executable on the first computer for presenting vendor information to the user. | Vendor data is included on a computer readable medium, such as a CD or DVD, which include marketing material and executables that correspond to, or advertise a source of the underlying products and are directed to purchasers of those products. | TV Guide is displayed on the CD/DVD. The CD/DVD itself displays screens that include the TV Guide logo. The CD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. The CD/DVD contains executable instructions that automatically open the menu and allow for playing the CD/DVD and viewing scenes. |
| 2. The apparatus of claim, further comprising: The label, wherein the computer readable instructions on the computer readable medium contain control data effective to control execution of the first processor. | The CD or DVD contains control data that controls execution of the processor on the user's computer. | The first processor, associated with the user, executes the control data on the CD/DVD. |
| 3. The apparatus of claim 2, wherein the control data is effective to establish communication between the first computer and the second computer | The control data on the CD or DVD establishes communication between the user's computer and the vendor's computer. | Communication is established between the user's computer and TV Guide's computer through web links. |
| 4. The apparatus of claim 3, wherein the control data is effective to program the first computer to communicate interactively with the second computer | The control data on the CD or DVD programs the user's computer to interact with the vendor's computer. | The user's computer communicates interactively with TV Guide's computer when web links contained on the CD/DVD are clicked on. |
| 5. The apparatus of claim 4, wherein the control data is effective to provide user authorization for collection of user information by the first computer. | The control data on the CD or DVD authorizes the user's computer to collect information about the user. | After inserting the CD/DVD and clicking on the TV Guide weblink, the user can go to a webpage where the user can sign up for a TVGuide.com account. |

| | | |
|---|---|---|
| 6. The apparatus of claim 4, wherein the control data is programmed to provide user authorization for transmission of user information from the first computer to the second computer. | The control data on the CD or DVD authorizes the transmission of user information from the user's computer to the vendor's computer. | When the user signs up for a TVGuide.com account, user information is sent from the user's computer to TV Guide's computer. |
| 7. The apparatus of claim 6, wherein the control data is programmed to authorize the transmission of user information at a time corresponding to a second purchase, different from a first purchase associated with distribution of the label. | The control data on the CD or DVD authorizes the transmission of user data when the user makes a second purchase from the vendor. | A user can subscribe to TV Guide by following the weblink contained on the CD/DVD. By subscribing, the user transmits billing information and makes an additional purchase. |
| 8. The apparatus of claim 2 wherein the control data further comprises executables for execution by the first computer. | The control data on the CD or DVD provides for the execution of programs on the CD or DVD. | The user's computer executes programs on the CD/DVD, including playing the content, menu, scene selection, etc. |
| 9. The apparatus of claim 1, further comprising a server operably connected between the first computer and the second computer. | The user's computer is connected to the vendor's computer by means of a server. | The user's computer communicates with TV Guide's computer when a weblink is clicked on via a server. |
| 10. The apparatus of claim 9, wherein the server is programmed to serve updated vendor data to the first computer. | The vendor's computer sends updated information to the user's computer via a server. | When the weblink is clicked on, updated information is sent to the user's computer. |

| | | |
|---|---|---|
| 26. A method for interactive communication between a vendor and a purchaser, the method comprising: Providing vendor data associated with a vendor and comprising executable instructions executable on a computer associated with a purchaser; | Vendor data is included on a computer readable medium, such as a CD or DVD, which includes executables to be run on the purchaser's computer. | TV Guide is displayed on the CD/DVD. The CD/DVD itself displays screens that include the TV Guide logo. The CD/DVD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. The CD/DVD contains executable instructions that automatically open the menu and allow for playing the CD/DVD and viewing scenes. |
| Recording the vendor data on a label comprising a computer-readable medium; | Vendor data is included on a computer readable medium | TV Guide' product includes a CD/DVD label containing vendor information that can be read by a computer. |
| Securing the label to a product; | A computer-readable medium label may be secured to products in any number of ways. | TV Guide' product includes a CD/DVD label that is secured to the product by a plastic case. |
| Distributing the product and label to a purchaser; | The product and label are distributed to the purchaser of the product. | The CD/DVD was distributed with the issue. |
| Reading the computer readable medium into the user computer associated with the purchaser; | The label can be read on the purchaser's computer. | The CD/DVD is readable by the purchaser's computer. |
| Establishing communication between the user computer and the vendor computer; and | The label, when read by the user's computer, establishes communication with the vendor's computer, possibly through the use of a link. | Communication is established when a weblink, contained on the CD/DVD, is clicked on. |
| Interactively updating user data on the vendor computer and vendor data on the user computer. | User data is provided to the vendor computer and vendor data is provided to the user computer by means of the communication established. | When the user clicks on a weblink, the user can sign up for a TVGuide.com account, thereby sending user data to TV Guide's computer, and information about TV Guide is sent to the user. |

| 29. An apparatus comprising: a network comprising a first computer, associated with a user and containing a first processor, operably connectable to a second computer, associated with a vendor and containing a second processor; | A computer is used to employ the digital label (CD or DVD), and a computer is associated with a vendor. These two computers are connected by a network. | The user's computer is connected to TV Guide's computer via a network, when a weblink is clicked on. |
|---|---|---|
| a product provided by the vendor; | The vendor provides some kind of product. | The issue is provided to consumers. |
| a label, connected to the product and comprising a face, visible to a user at a point of purchase; | Providing a computer-readable medium label that may be secured to products in any number of ways, which is displayed to a purchaser at the time of purchase. | The CD/DVD contains a label identifying TV Guide as the source and the CD/DVD was secured to the magazine by plastic that made the label of the CD/DVD visible to the buyer at the time of purchase. |
| the label, further comprising a computer readable medium and adapted to be selectively secured to and removed from the product corresponding to the vendor and purchased by the user; | A computer-readable medium label may be secured to products in any number of ways to designate a source of the products (or indicate a manufacturer, distributor, or seller of the products). | TV Guide' product includes a CD/DVD label that is secured to the product by a plastic case. The CD/DVD corresponds to TV Guide. |
| the label, wherein the computer readable medium further contains vendor data, provided from the second computer by the vendor, and computer readable instructions executable on the first computer for presenting vendor information to the user; | Vendor data is included on a computer readable medium, such as a CD or DVD, which include marketing material and executables that are presented to the user. | TV Guide is displayed on the CD/DVD. The CD/DVD itself displays screens that include the TV Guide logo. The CD/DVD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. The CD/DVD contains executable instructions that automatically open the menu and allow for playing the CD/DVD and viewing scenes. |
| the label, further comprising information visible on the | The label has an image that conveys advertising information | The CD/DVD contains a label identifying TV Guide |

| | | |
|---|---|---|
| face and presenting an advertising impression, corresponding to the at least one of the vendor and the product, to the user at the point of purchase; | to the purchaser at the time of the purchase. | as the source. |
| a securement mechanism configured to selectively secure to and release from the product the label; and | A computer-readable medium label may be secured to products in any number of ways. | TV Guide' product includes a CD/DVD label that is secured to the product by a plastic case. |
| the label, wherein the vendor information is operably independent and substantively distinct from the product. | Providing a computer-readable medium label distinct from the product that contains the vendor data and may be secured to products in any number of ways. | The CD/DVD itself displays screens that include the TV Guide logo. The CD/DVD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. |
| 31. An article comprising: a computer readable medium integrated with a label and storing operational and executable data structures, the data structures being configured to be readable by a first computer, associated with a purchaser of a product; | A computer is used to employ the digital label (CD or DVD), which includes marketing material and executables. | The CD/DVD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. The CD/DVD contains executable instructions that automatically open the menu and allow for playing the CD/DVD and viewing scenes. |
| the computer readable medium, wherein the data structures further comprise vendor data, profiling data, and linking data; | The digital label (CD or DVD) contains vendor data, profiling data (or information corresponding to the purchaser), and linking data (which controls communication between the user's computer and vendor's computer). | There is information about TV Guide and weblinks on the CD/DVD. When the weblinks are clicked on, the user is directed to a site in which user information is collected. |
| the computer readable medium, wherein the vendor data is associated with a source of the product and comprises instructions executable by the first | Vendor data is included on a computer readable medium, which includes marketing material and executables that correspond to, or advertise a source of the underlying | The CD/DVD contains executable instructions that automatically open the menu and allow for playing the CD/DVD and viewing scenes. |

| computer to present to the purchaser a presentation provided from the vendor; | products and are directed to purchasers of those products. | |
|---|---|---|
| the computer readable medium, wherein the profiling data comprises instructions executable by the first computer to obtain information corresponding to the purchaser and relating to the vendor; | Profiling data (or information corresponding to the purchaser) is obtained from the purchaser's computer by means of a computer readable medium, such as a CD or DVD. | When the weblinks are clicked on, the user is directed to a site in which user information is collected. |
| the computer readable medium, wherein the linking data comprises instructions executable to control communication of the first computer with a second computer associated with the vendor; | Linking data on the computer readable medium, such as a CD or DVD, controls communication between the vendor's computer and the user's computer. | When the weblinks are clicked on, communication is established between the user's computer and TV Guide's computer. |
| the label, labeling and being removably connected to the product offered for sale; | A computer-readable medium label may be secured to products in any number of ways. | TV Guide' product includes a CD/DVD label that is secured to the product by a plastic case. |
| the label, further comprising a face presenting an image, visible to and presenting an advertising impression to, the purchaser at a point of purchase; and | The label has an image that conveys advertising information to the purchaser at the time of the purchase. | The CD/DVD contains a label identifying TV Guide as the source. |
| the label, wherein the advertising impression corresponds to at least one of a vendor of the product, a manufacturer thereof, and the product and is operably independent and substantively distinct therefrom. | Providing a computer-readable medium label distinct from the product that contains the information about the vendor, manufacturer, or product as an advertisement, and may be secured to the product in any number of ways. | TV Guide is displayed on the CD/DVD. The CD/DVD itself displays screens that include the TV Guide logo. The CD/DVD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. |

| | | |
|---|---|---|
| 37. A method comprising: providing vendor data corresponding to a source of products and directed to purchasers of the products, a purchaser of the purchasers being associated with a computer of the purchaser; | Providing vendor data such as marketing material, including executables and non-executables that correspond to, or advertise a source of the underlying products directed to purchasers. | The CD/DVD itself displays screens that include the TV Guide logo. The CD/DVD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. |
| providing a label designating a source of the products, securable to the product, substantively distinct therefrom, and operably independent therefrom; | Providing a computer-readable medium label that contains the vendor data and may be secured to products in any number of ways to designate a source of the products or indicate a manufacturer, distributor, or seller of the products. | The CD/DVD contains a label identifying TV Guide as the source. |
| the providing, wherein the label comprises a face, visible to a purchaser at a point of purchase; | Providing a computer-readable medium label that contains the vendor data and may be secured to products in any number of ways to designate a source of the products or indicate a manufacturer, distributor, or seller of the products. | The CD/DVD was secured to the magazine by plastic that made the label of the CD/DVD visible to the buyer at the time of purchase. |
| providing an image on the face, the image delivering an advertising impression to the purchaser at the point of purchase; | The label has an image that conveys advertising information to the purchaser at the time of the purchase. | The CD/DVD contains a label identifying TV Guide as the source. |
| the providing the label, wherein the label is integrated with a computer readable medium, readable by a computer of the purchaser; | The label can be read by the purchaser's computer. | The CD/DVD is readable by the purchaser's computer. |
| recording the vendor data on the computer readable medium to be readable by and operable on the purchaser computer, the vendor data being operably independent and substantively distinct from the product; | Providing vendor data such as marketing material, including executables and non-executables, on a medium that can be read on the purchaser's computer. | The CD/DVD is readable by the purchaser's computer. |

| | | |
|---|---|---|
| securing the label to a product, of the products, to be removable by the purchaser; and | The label secured to the product. | The CD/DVD label is a label that is secured to the product by a plastic encasement. |
| distributing the label and product to the purchaser. | Distributing the label and product to a purchaser. | The CD/DVD was distributed with the issue. |
| 47. A method comprising: providing a label selectively securable to products to designate a source of the products and comprising a computer readable medium; | A computer-readable medium label may be secured to products in any number of ways to designate a source of the products (or indicate a manufacturer, distributor, or seller of the products). | The CD/DVD contains a label identifying TV Guide as the source and it is secured to the product by a plastic encasement. |
| providing vendor data corresponding to the source and directed to purchasers of the products; | Providing vendor data such as marketing material, including executables and non-executables that correspond to, or advertise a source of the underlying products directed to purchasers. | TV Guide brand is displayed on the CD/DVD. The CD/DVD itself displays screens that include the TV Guide logo throughout. TV Guide's CD/DVD contains executable instructions that automatically open the menu, allow for playing the CD/DVD and viewing scenes. |
| recording the vendor data on the computer readable medium to be readable by a first computer associated with a retail purchaser, from among the purchasers of the products, the vendor data being operably independent and substantially distinct from the product; | Providing vendor data such as marketing material, including executables and non-executables, on a medium that can be read on the purchaser's computer. | The CD/DVD is readable by the purchaser's computer. |
| the providing vendor data, further comprising providing instructions executable by the first computer to present to the retail purchaser access, from the vendor, to a presentation to the purchaser; | Vendor data is included on a computer readable medium, such as a CD or DVD, which include marketing material and executables that correspond to, or advertise a source of the underlying products and are directed to purchasers of those products. | TV Guide is displayed on the CD/DVD. The CD/DVD itself displays screens that include the TV Guide logo. The CD/DVD is distinct from the product and contains executable instructions including playing the content, menu, scene selection, etc. The |

|  |  | CD/DVD contains executable instructions that automatically open the menu and allow for playing the CD/DVD and viewing scenes. |
|---|---|---|
| the providing the label, further comprising providing a face thereof presenting an image, visible to and presenting an advertising impression to, the purchaser at a point of purchase; | The label has an image that conveys advertising information to the purchaser at the time of the purchase. | The CD/DVD contains a label identifying TV Guide as the source. |
| securing the label to the product; | The label secured to the product. | The CD/DVD label is a label that is secured to the product by a plastic encasement. |
| distributing the label and product to the purchaser. | Distributing the label and product to a purchaser. | The CD/DVD was distributed with the issue. |

TV Guide provides numerous examples of prior art and patents that were presented to the PTO during the prosecution of the '332 and the '686 Patents which were soundly rejected by the PTO as non-labels.  Further, none of those cited examples[2] teaches, or identifies what is taught as a label in its entirety as provided in Etagz's asserted claims in the chart above.

TV Guide attempts to construe Etagz's asserted claims from the '332 Patent based on the prosecution history of the '686 Patent.  Such an approach is nonsensical because the '686 Patent issued ten (10) years after the '332 Patent.  In *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340 (Fed. Cir. 2004), the court, in discussing *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322 (Fed. Cir. 1999), stated:

> [W]e rejected the argument that the patentee was "bound by" statements made by
> the applicant in connection with a later application after the patent in suit had

---

[2] *See* Motion, Statement of Facts ¶¶ 14 – 15, 18 – 21, 23 – 24, 26 – 29, 35 – 52, and 57 – 61.  Not one of the examples of distinguished or non-infringing prior art or patents set forth in these numbered statements of facts identifies each and every limitation in Etagz's asserted claims from the '332 Patent.

> already issued.  .  .  .  We rejected the argument that the patentee was bound, or
> estopped, by a statement made in connection with a later application on which the
> examiner of the first application could not have relied.

*Microsoft*, 357 F.3d at 1350; *see also Advanced Cardiovascular Sys., Inc. v. Meditronic*, 265

F.3d 1294 (Fed. Cir. 2001) (the court would not apply the prosecution histories of <u>subsequently</u>

issued patents in its claim construction proceedings.)    Likewise, TV Guide's reliance upon

statements made by Etagz in connection with the '686 Patent is without merit.

And further, in *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973 (Fed. Cir. 1999), the court

stated that "[w]hen multiple patents derive from the same initial application, the prosecution

history regarding a claim limitation in any patent that has issued applies with equal force to

***subsequently*** issued patents that contain the same claim limitation."  *Elkay*, 192 F.3d at 980

(emphasis added).  Simply put, the use of the prosecution history of a related patent may be

applied to the claims construction of subsequently issued patents, but not vice-versa.

Accordingly, the '686 Patent's prosecution history is irrelevant to the construction of Etagz's

'332 Patent claims.

In the present matter, TV Guide has failed to cite any authority that provides that a

<u>subsequently</u> issued patent's prosecution history may be used to define or interpret claims of a

<u>previously</u> issued patent.  As made clear in *Elkay* and applicable here, the federal courts do not

apply prosecution histories from later-issued patents in construing claims of earlier-issued

patents.  Accordingly, the '686 Patent's prosecution history should not be used in determining

the interpretation of Etagz's asserted claims from the '332 Patent.

Assuming *arguendo* that the '686 Patent's prosecution history would apply to the claims

construction of the '332 Patent, which is denied, TV Guide still fails to meet its burden because

none of the examples of prior art or patents cited in the '686 Patent's prosecution history satisfy every limitation of Etagz's asserted claims from the '332 Patent as set forth in the chart above.

i.        **Examples**

For example, the examiner on the '686 Patent stated:  "The book, or a magazine or other media that commonly has included software does not need a label, for it has the relevant information printed directly on it.  A CD attached to a book [or magazine] is therefore not considered a label for the book [or magazine]."  This argument was further examined and rejected as inapplicable during reexamination.  Thus, it is easily distinguished from the present case where TV Guide's CDs and DVDs do not just include software, but also contain control data that allow TV Guide to collect data from the user, with permission from the user, and then transmit that data back to TV Guide.  This is at least one material difference between the cited prior art and patents and the '332 Patent's definition of "label."

This same interpretation applies to the '686 Patent examiner's statement that a label "would not . . . typically include software attached to say, a book (even if the software has on it information in common with the book) because that software is not a label of the book per se."  The examiner's statement reveals the absence of control data that allow TV Guide to collect data from the user, with permission from the user, and then transmit that data back to TV Guide as taught by the term "label" in the '332 Patent.

The following additional examples cited by TV Guide from the '686 Patent's prosecution history which, although should not be used to construe the '332 Patent's asserted claims, are nonetheless inapplicable to this Court's claims construction efforts with regard to the '332 Patent.  The '201 Patent states that "[i]n the computer arts, many major computer-related

magazines such as BYTE, PCWORLD and others, supply CD-ROMS to their subscribers with certain magazine issues."  TV Guide's Statement of Facts, ¶ 21.  The '117 Patent discloses methods of packaging CDs with books and magazines.  TV Guide's Memo, p. 7.  "PC Gamer" and "Covermount" are both magazines which include CDs placed "in a transparent plastic sleeve and mount[ed] [] on the cover of the magazine with adhesive tape or glue."  TV Guide's Statement of Facts ¶¶ 23 and 27.  Not one of these examples references the control data that allow TV Guide to collect data from the user, with permission from the user, and then transmit that data back to TV Guide as taught by the term "label" in the '332 Patent.

TV Guide also cites a prior art reference in the '332 Patent's prosecution history—"Mojo Magazine"—for the proposition that TV Guide's accused products do not constitute a label under the '332 Patent.  TV Guide makes specific reference to certain characteristics, such as (1) a CD that is clearly viewable from the front of the magazine and (2) the name of the magazine printed on the face of the magazine.  While TV Guide's accused magazines have some characteristics in common with Mojo Magazine, this comparison fails because it does not take into consideration the '332 Patent's limitations of having more than linear data (audio music files of songs) and control data that allows TV Guide to present a multi-media presentation, collect data from the user, with permission from the user, and then transmit that data back to TV Guide as taught by the term "label" in the '332 Patent.

Further examples of inapplicable prior art and patents as cited by TV Guide stem from the reexamination of the '332 Patent.  For example, Etagz explained that the '401 Patent "discloses a method of producing a printed product, such as a book or magazine, having a packaged compact disk included within the printed product.  [Etagz] . . . did not find any

suggestion . . . that the disclosed disk would act as a label for the printed product.  Thus, the disk . . . is not a label."  TV Guide's Statement of Facts, ¶ 42.

The examiner further explained that although CVG Magazine's flexi-disc includes "a special message to [CVG] . . . readers, the flexi-disc essentially including games cannot be understood by one of the ordinary skill in the art as labeling for the product 'CVG Magazine' in light of the specification of the '332 Patent."  TV Guide's Statement of Facts, ¶ 49.  Once again, the absence of control data that allow TV Guide to collect data from the user, with permission from the user, and then transmit that data back to TV Guide distinguishes the '401 Patent and CVG Magazine from Etagz's asserted claims in the '332 Patent.

TV Guide further attempts to dodge infringement by claiming that its CDs and DVDs are merely gifts of a promotional nature from TV Guide.  Nowhere in the '332 Patent's claims is there a carve-out for labels that may be determined to be promotional gifts.  TV Guide's argument on this front is a red herring.  And, such a comparison is meaningless to the Court's determination of TV Guide's infringement of the Etagz Patent.

TV Guide further claims that Etagz has chosen to ignore its earlier exclusion of Mojo Magazine, CVG Magazine, and the '401 Patent from the definition of label by asserting infringement claims against TV Guide for its infringing magazines.  On the contrary, and as explained above, neither Mojo Magazine, CVG Magazine, or the '401 Patent has anything to do with Etagz's infringement claims against TV Guide.  While the aforementioned prior art and patent do not satisfy the elements of a "label" as defined in the '332 Patent, TV Guide's magazines with attached CDs and DVDs do satisfy the same elements.  Accordingly, TV Guide's accused products do infringe the '332 Patent.  Alternatively, and at the very least, these

facts are sufficiently disputed with regard to TV Guide's claim of non-infringement to create a genuine issue of material fact.  Regardless, summary judgment is improper.

> **B.**    **TV Guide's Use of CDs and DVDs to Provide Additional Content to the Purchaser is Inapplicable to the Determination of TV Guide's Infringement of the '332 Patent.**

Indeed, providing "additional content" on CDs and DVDs has been practiced for years, but a "label" as taught by the '332 Patent involves much more than just providing "additional content."  The '332 Patent's reach extends to CDs or computer-readable media attached to magazines and books with control data that allow TV Guide to collect data from the user, with permission from the user, and then transmit that data back to TV Guide.  Therefore, TV Guide's comparison of its accused products to the '494 Patent—which taught that "disk products [may be] marketed in conjunction with documentation, instruction manuals, a companion book product, catalogs or other related conventional paperbound printed materials" such that the magazine and the CD or DVD constitute one product—is of little import to the analysis of TV Guide's infringement of the '332 Patent.  TV Guide's Statement of Facts, ¶ 59.  To be sure, TV Guide has already stated that its CDs and DVDs are "gifts," "free," or "promotional" in nature.  As such, the CDs/DVDs satisfy the '332 patent element that requires the CD to be distinct from the product or magazine itself.

TV Guide also claims that the increased price for its magazines that included attached CDs and DVDs further indicates that the same CDs and DVDs were companion products with the magazine.  Price has nothing to do with TV Guide's infringing products.  As admitted in its statement of facts, the eight magazines that TV Guide sold with attached CDs and DVDs cost roughly $0.50 to $1.00 more than a magazine without a CD or DVD.  TV Guide provides no

authority to suggest that an increased price equates to the CD being deemed an additional or companion product to the one to which it is attached.  The additional cost, for all intents and purposes, can be attributed to the cost of manufacturing and attaching the CD or DVD to the magazine.  Without more, TV Guide's increased cost argument fails.

**C.     Joint Infringement is Not Required for a Finding of Infringement of Etagz's Asserted Claims.**

Section 271(a) of title 35 sets forth the requirements for a claim of direct infringement of a patent.  It provides:

> Except as otherwise provided in this title, whoever without authority ***makes***, uses, ***offers to sell, or sells any patented invention***, within the United States or imports into the United States any patented invention ***during the term of the patent therefor, infringes the patent.***

(emphasis added).  In other words, by merely making, offering for sale, or selling its accused products, TV Guide is liable for direct infringement of the '332 Patent.  Therefore, it is unnecessary for this Court to address joint infringement as suggested by TV Guide in order to establish a case of direct infringement of Etagz's apparatus claims against TV Guide.

Section 271(b) of title 35 sets forth the requirements for a claim of indirect infringement of method claims of a patent:  "Whoever actually induces infringement of a patent shall be liable as an infringer."  Under this provision, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."  *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed. Cir. 1990), *quoted in DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part).  "[A] finding of inducement requires a threshold finding of direct infringement-either a finding of specific instances of direct infringement or a finding that

the accused products necessarily infringe." *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1341 (Fed. Cir. 2008) (citing *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).  "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities."  *DSU Med.,* 471 F.3d at 1306.  Intent may be proven through circumstantial evidence, just as with direct infringement.  *See id.*; *see also Fuji Photo Film Co. v. Jazz Photo Corp.,* 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence.")  Evidence of active steps taken to induce infringement, such as advertising an infringing use, can support a finding of an intention for the product to be used in an infringing manner. *DSU Med.,* 471 F.3d at 1305 (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005)).

In the present case, Etagz has pled sufficient facts to create a genuine dispute of material fact regarding TV Guide's indirect infringement of the '332 Patents method claims, *i.e.*, inducement of infringement.  A simple search of public records available through the PTO's website would have alerted TV Guide as to the infringing nature of their attached CDs and DVDs.  Such due diligence is an industry-wide standard, particularly in this modern era of continual technological advancements.  As such, TV Guide should have known that their accused products infringed, at the very least, the method claims of the '332 Patent.

Furthermore, TV Guide cannot deny that it attached its infringing CDs and DVDs to its magazines without a beneficial purpose in mind.  It can, and should be implied, that TV Guide attached its infringing CDs and DVDs to its magazine in an effort to appeal to consumer preferences and/or to increase sales of its magazines.  And as indicated by the Federal Circuit in

*DSU Med.*, any evidence of TV Guide's active steps taken to induce infringement, such as TV Guide advertising an infringing use, can support a finding of an intention for the TV Guide's accused products to be used in an infringing manner.  Accordingly, TV Guide has met all the requirements for a finding of inducement of infringement.  Alternatively, and at the very least, TV Guide's statement of facts are sufficiently disputed so as to create a genuine issue of material fact.  Therefore, summary judgment is improper.

> **D.      Etagz Can Assert Infringement Against TV Guide Based on New Claims Added to the '332 Patent During the Reexamination.**

According to 35 U.S.C.A § 307(b), "Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding will have the same effect as that specified in section 252 of this title…"  Section 252 specifies that the proposed amended or new claims referred to above "shall constitute a continuation thereof [of the original patent] and have effect continuously from the date of the original patent" to the extent that the proposed amended or new claims are "substantially identical" with those claims of the original patent.  *See* 35 U.S.C.A. § 252.

Therefore, the main inquiry in determining whether the amended or newly added claims are effective from the date of the original patent is whether the new claims are "substantially identical" to the claims of the original patent.  Clearly, claims are substantially identical if they are without substantive change.  *See id.*  The use of different words is immaterial if the scope of the claims is identical.  *See id.*  A new claim that merely clarifies a previous claim to make specific what was implied or that makes the previous claim more definite without altering the scope is not viewed as a substantive change.  *See id.*  To determine whether a claim change is substantive, "it is necessary to analyze the claims of the original and reexamined patents in light

of the particular facts, including the prior art, the prosecution history, other claims, and any other

pertinent information." *Id.*

In the instant matter, newly added claims 29, 31, 37 and 47 all contain the phrase

"advertising impression," which clarifies what was implied in the specification of the '332

Patent. The bolded words and phrases below are just a few examples of language in the '332

Patent specification that imply the use of the phrase "advertising impression," and which the

newly added claims seek to clarify:

> A vendor may choose to provide **a product, brand, vendor or other name on a visible face of a CD-ROM** tag. In general, **the name and other information provided on the visible face of the CD-ROM tag** represent vendor identification, in general. Other vendor identification may include slogans, which may themselves be trademarked or registered as trademarks. **Messages and other marks or trademarks proprietary to a vendor for ready identification to users (purchasers, consumers) while providing additional impressions on behalf of a vendor**.
>
> Typically, **logos may be prominent on the visible face of a CD-ROM** tag. Likewise, **various images or symbols** related to either the content of the CD-ROM tag, the product on which the CD-ROM tag is affixed, or related to other aspects of the vendor providing the CD-ROM tag **may be provided in any number of colors with suitable graphic appeal**.

Exh. A, Column 5: 37 – 54. The newly added claims can be characterized as substantially

identical to the original claims in the '332 Patent. Accordingly, the newly added claims are

effective as of the date that the original '332 Patent issued, years before TV Guide began

manufacturing, offering for sale, and/or selling its accused products.

IV.    **CONCLUSION**

Based on the foregoing, it is clear that there exist genuine issues of material fact.

Accordingly, Plaintiff respectfully requests that this Court deny Defendant TV Guide's motion

for summary judgment.

DATED this 23rd day of March, 2012.

PIA ANDERSON DORIUS REYNARD & MOSS

/s/ Joseph G. Pia
Joseph G. Pia
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of March, 2012, I caused a true and correct copy of the foregoing **PLAINTIFF ETAGZ, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT TV GUIDE MAGAZINE, LLC'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT** to be served via the Court's ECF filing system upon the following:

Josephine K. Benkers
Matthew J. Duchemin
Martha Jahn Snyder
Anthony A. Tomaselli
QUARLES BRADY
33 East Main Street, Suite 900
Madison, WI  53703
josephine.benkers@quarles.com
matthew.duchemin@quarles.com
martha.jahn@quarles.com
anthony.tomaselli@quarles.com

Michael James Curley
QUARLES BRADY
2 North Central Avenue
1 Renaissance Square
Phoenix, AZ  85004
michael.curley@quarles.com

David M. Bennion
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
P.O. Box 45898
Salt Lake City, UT  84145
ecf@parsonsbehle.com

H. Dickson Burton
Edgar R. Cataxinos
Steven W. Gutke
Krista Weber Powell
TRASKBRITT PC
230 South 500 East, Suite 300
P.O. Box 2550
Salt Lake City, UT  84110
hdburton@traskbritt.com
ercataxinos@traskbritt.com
swgutke@traskbritt.com
kwpowell@traskbritt.com

/s/ Joseph G. Pia
_____
Joseph G. Pia
*Attorneys for Plaintiff*